# UNITED STATES *v.* DES MOINES NAVIGATION AND RAILWAY COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF IOWA.

No. 987. Argued November 18, 19, 1891. — Decided January 11, 1892.

The title of the Des Moines Navigation and Railway Company to lands granted to the Territory of Iowa for the purpose of aiding in the improvement of the navigation of the Des Moines River by the act of August 8, 1846, 9 Stat. 77, c. 103, and to the State of Iowa for a like purpose by the joint resolution of March 2, 1861, 12 Stat. 251, and by the

act of July. 12, 1862, 12 Stat. 543, c. 161, having been sustained by this court in eight litigations between private parties, to wit: in *Dubuque & Pacific Railroad* v. *Litchfield*, 23 How. 66; *Wolcott* v. *Des Moines Co.*, 5 Wall. 681; *Williams* v. *Baker*, 17 Wall. 144; *Homestead Co.* v. *Valley Railroad*, 17 Wall. 153; *Wolsey* v. *Chapman*, 101 U. S. 755; *Litchfield* v. *Webster County*, 101 U. S. 773; *Dubuque & Sioux City Railroad* v. *Des Moines Valley Railroad*, 109 U. S. 329, and *Bullard* v. *Des Moines & Fort Dodge Railroad*, 122 U. S. 167, is now held to be good against the United States, as a grant *in præsenti.*

It is an undoubted proposition of law that the grantor of lands conveyed in trust is the only party to challenge the title in the hands of the trustee, or others holding under him, on account of a breach of that trust.

It appearing that the United States is only a nominal party, whose aid is sought to destroy the title of the Navigation Company and its grantees, in order to enable settlers to protect their titles, initiated by settlement and occupancy, the court holds the case of *United States* v. *Beebe*, 127 U. S. 338, to be applicable, where it was held that when a suit is brought in the name of the United States to enforce the rights of individuals, and no interest of the government is involved, the defence of laches and limitations will be sustained, as though the government were out of the case.

Where relief can be granted only by setting aside an evidence of title issued by the government, in the orderly administration of the affairs of the Land Department, the evidence in support must be clear, strong and satisfactory.

A general averment of fraud in a bill in equity, though repeated, is to be taken as qualified and limited by the specific facts set forth to show wherein the transaction was fraudulent; and in such case a demurrer to the bill admits only the truth of the facts so set forth and all reasonable inferences to be drawn therefrom.

The knowledge and good faith of a legislature are not open to question, but the presumption is conclusive that it acted with full knowledge and in good faith; and in this case the circumstances surrounding the transaction not only preclude the idea of misconduct or ignorance on the part of the legislature, but it is clear that the Navigation Company was a *bona fide* purchaser, within the meaning of the resolution of 1861, and intended as a beneficiary thereunder.

THE court stated the case as follows:

On August 8, 1846, an act was passed by the Congress of the United States granting certain lands to the then Territory of Iowa, to aid in the improvement of the navigation of the Des Moines River. 9 Stat. 77, c. 103. The first section defined the extent of the grant, and is in these words:

"*Be it enacted by the Senate and House of Representatives*

*of the United States of America in Congress assembled,* That there be, and hereby is, granted to the Territory of Iowa, for the purpose of aiding said Territory to improve the navigation of the Des Moines River from its mouth to the Raccoon Fork (so-called) in said Territory, one equal moiety, in alternate sections, of the public lands, (remaining unsold, and not otherwise disposed of, encumbered or appropriated,) in a strip five miles in width on each side of said river; to be selected within said Territory by an agent or agents to be appointed by the governor thereof, subject to the approval of the Secretary of the Treasury of the United States."

On January 9, 1847, (the Territory in the meantime having become a State,) its first general assembly passed a joint resolution accepting this grant. A question soon arose as to its extent. The northern limit of the improvement was the Raccoon Fork; and the contention on one side was that the grant extended no further than the improvement, and on the other, that, there being no limitation in the granting clause, it included lands on either side of the river up to its source, or at least to the northern boundary of the State.

This question was submitted at various times to the general executive officers of the United States having charge of the Land Department, with the result that conflicting opinions were given by them thereon. On February 23, 1848, Richard M. Young, the Commissioner of the General Land Office, by letter addressed to the state authorities, ruled that "the State is entitled to the alternate sections within five miles of the Des Moines River, throughout the whole extent of that river, within the limits of Iowa."

On March 2, 1849, Robert J. Walker, Secretary of the Treasury, to whose department at that time the control of the administration of public lands belonged, replying to a communication from the representatives of the State of Iowa in Congress, sustained the ruling of the Commissioner of the General Land Office. In his letter he says: "I concur with you in the views contained in your communication, and am of the opinion that the grant in question extends, as therein stated, on both sides of the river, from its source to its mouth,

but not to lands on the river in the State of Missouri. I have transmitted your communication and accompanying papers, with a copy of this letter, to the Commissioner of the General Land Office."

On June 1, 1849, notice was issued from the General Land Office to the registers and receivers of the local land offices to reserve from sale all the odd-numbered sections within five miles of the river up to the northern limits of the State, and lists were directed to be prepared of the sales and locations within those limits already made, with a view of certifying the remainder to the State. After these lists had been completed, but before any further action was taken, the Department of the Interior was created by Congress, and the administration of public lands transferred to that department; and on April 6, 1850, Thomas Ewing, the Secretary of the Interior, ruled that the Raccoon Fork was the limit of the grant. His ruling is contained in a letter of that date, to the Commissioner of the General Land Office, as follows:

"Sir : Having considered the question submitted to me connected with the claim of the State of Iowa to select, under the act of August 8, 1846, lands for the improvement of the Des Moines River, I am clearly of the opinion that you cannot recognize the grant as extended above the Raccoon Fork without the aid of an explanatory act of Congress. It is clear to my mind, from the language of the act of August 8, 1846, itself, that it was not the intent of the act to extend it further."

He, however, added this further direction:

"As Congress is now in session, and may take action on the subject, it will be proper, in my opinion, to postpone any immediate steps for bringing into market the lands embraced in the State's selections."

Application was made to the President to reverse this ruling. The question was referred by the President to the Attorney General, and, on July 19, 1850, Reverdy Johnson, the then Attorney General, advised the President that he concurred with the views of the Secretary of the Treasury, and dissented from those of the Secretary of the Interior;

holding that the grant extended to the northern limits of the State.

Before any action was taken on this opinion, President Taylor died, and a new administration succeeded; and, on June 30, 1851, the then Attorney General, John J. Crittenden, in response to inquiry, gave it as his opinion, differing from his predecessor, that the grant terminated at the Raccoon Fork. The Secretary of the Interior concurred in the opinion of the Attorney General, but at the same time continued the reservation of the lands from market made by his predecessor; and afterwards, believing that the question of title was one for the decisions of the courts, approved the selection made by the State, up to the northern limits, without prejudice to the rights of other parties. His letter of instructions to the Commissioner of the General Land Office, of date October 29, 1851, was in these words:

"DEPARTMENT OF THE INTERIOR,
"*Washington, October* 29, 1851.

"SIR: I herewith return all the papers in the Des Moines case, which were recalled from your office about the first of the present month.

"I have reconsidered and carefully reviewed my decision of the 26th of July last, and, in doing so, find that no decision which I can make will be final, as the question involved partakes more of a judicial than an executive character, which must ultimately be determined by the judicial tribunals of the country; and although my own opinion on the true construction of the grant is unchanged, yet, in view of the great conflict of opinion among the executive officers of the government, and also in view of the opinions of several eminent jurists which have been presented to me in favor of the construction contended for by the State, I am willing to recognize the claim of the State, and to approve the selections, without prejudice to the rights, if any there be, of other parties, thus leaving the question as to the proper construction of the statute entirely open to the action of the judiciary. You will please, therefore, as soon as may be practicable, submit for my ap-

proval such lists as may have been prepared, and proceed to report for like approval lists of the alternate sections claimed by the State of Iowa, above the Raccoon Fork, as far as the surveys have progressed, or may hereafter be completed and returned.   "Very respectfully, etc.,

"A. H. H. STUART, *Secretary.*
"The Commissioner of the General Land Office."

And the lists having been made out, were by the Secretary approved in the qualified way indicated in the letter, and thereafter transmitted to the state authorities and to the local land offices

Subsequently, and at its December term, 1859, the question as to the extent of the grant came before this court, and in the case of *Dubuque & Pacific Railroad* v. *Litchfield*, 23 How. 66, it was held that the Raccoon Fork was the northern limit of the grant, and that the State took no title to lands above that fork. After this decision, and on March 2, 1861, a joint resolution passed Congress, in these words:

"*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That all the title which the United States still retain in the tracts of land along the Des Moines River, and above the mouth of the Raccoon Fork thereof, in the State of Iowa, which have been certified to said State improperly by the Department of the Interior, as part of the grant by act of Congress approved August eight, eighteen hundred and forty-six, and which is now held by bona fide purchasers under the State of Iowa, be, and the same is hereby, relinquished to the State of Iowa." 12 Stat. 251.

And on July 12, 1862, the following act:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the grant of lands to the then Territory of Iowa, for the improvement of the Des Moines River, made by the act of August eight, eighteen hundred and forty-six, is hereby extended so as to include the alternate sections (designated by odd numbers) lying within five miles of said river, between

the Raccoon Fork and the northern boundary of said State; such lands are to be held and applied in accordance with the provisions of the original grant, except that the consent of Congress is hereby given to the application of a portion thereof to aid in the construction of the Keokuk, Fort Des Moines and Minnesota railroad, in accordance with the provisions of the act of the general assembly of the State of Iowa, approved March twenty-two, eighteen hundred and fifty-eight. And if any of said lands shall have been sold or otherwise disposed of by the United States before the passage of this act, excepting those released by the United States to the grantees of the State of Iowa under the joint resolution of March second, eighteen hundred and sixty-two, the Secretary of the Interior is hereby directed to set apart an equal amount of lands within said State to be certified in lieu thereof: *Provided,* That if the said State shall have sold and conveyed any portion of the lands lying within the limits of this grant the title of which has proved invalid, any lands which shall be certified to said State in lieu thereof by virtue of the provisions of this act shall inure to and be held as a trust fund for the benefit of, the person or persons respectively whose titles shall have failed as aforesaid." 12 Stat. 543, c. 161.

Long prior to the last three matters noticed, the State had taken action in respect to the improvement of the Des Moines River and had disposed of the lands covered by the grant as it was claimed to be, including those above as well as those below the Raccoon Fork. Such action and disposition had been in this way: Some work was done by the State, in the first instance, through its board of public works. Thereafter, and on December 17, 1853, a contract was made with Henry O'Reilly therefor. This was released on June 8, 1854, and on June 9, 1854, a new contract was entered into between the State and the principal defendant herein, the Des Moines Navigation and Railway Company. By its terms, the navigation company was to expend in the improvement not less than $1,300,000, and to receive in pay the lands at $1.25 per acre; the lands to be conveyed from time to time as $30,000 worth of work was done, in pursuance of the original act of Congress.

Under this agreement, the navigation company proceeded to do some work on the improvement.   On March 22, 1858, the State of Iowa passed an act, whose recital and first clause are as follows :

"Whereas the Des Moines Navigation and Railroad Company have heretofore claimed, and do now claim, to have entered into certain contracts with the State of Iowa, by its officers and agents, concerning the improvement of the Des Moines River, in the State of Iowa; and whereas disagreements and misunderstandings have arisen, and do now exist, between the State of Iowa and said company, and it being conceived to be to the interests of all parties concerned to have said matters, and all matters and things between said company and the State of Iowa, settled and adjusted: Now, therefore, be it

"*Resolved by the General Assembly of the State of Iowa,* That for the purpose of such settlement, and for that purpose only, the following propositions are made by the State to said company : That the said company shall execute to the State of Iowa full releases and discharges of all contracts, agreements and claims with or against the State, including rights to water rents which may have heretofore or do now exist, and all claims of all kinds against the State of Iowa, and the lands connected with the Des Moines River improvement, excepting such as are hereby by the State secured to the said company ; and also surrender to said State the dredge-boat and its appurtenances, belonging to said improvement; and the State of Iowa shall, by its proper officer, certify and convey to the said company all lands granted by an act of Congress, approved August 8th, 1846, to the then Territory of Iowa, to aid in the improvement of the Des Moines River, which have been approved and certified to the State of Iowa by the general government, saving and excepting all lands sold or conveyed, or agreed to be sold or conveyed, by the State of Iowa, by its officers and agents, prior to the 23d day of December, 1853, under said grant, and said company or its assignees, shall have right to all of said lands as herein granted to them as fully as the State of Iowa could have under or by

virtue of said grant, or in any manner whatever, with full power to settle all errors, false locations, omissions or claims in reference to the same, and all pay or compensation therefor by the general government, but at the costs and charges of said company, and the State to hold all the balance of said lands, and all rights, powers and privileges under and by virtue of said grant, entirely released from any claim by or through said company; and it is understood that among the lands excepted and not granted by the State to said company are 25,487.87 acres lying immediately above Raccoon Fork, supposed to have been sold by the general government, but claimed by the State of Iowa." Revised Laws of Iowa, 1860, p. 906.

The proposition of settlement made by this act was accepted by the navigation company on April 15, 1858, and the terms of the settlement carried into effect. On April 28, 1858, the governor of the State certified to the President the amount expended in the work, and the amount of land to be conveyed to the navigation company under the settlement. The certificate was in these words:

"Executive Chamber, Iowa,

"*Des Moines, April* 28, 1858.

"To His Excellency James Buchanan, President of the United States:

"I, Ralph P. Lowe, governor of the State of Iowa, as required by act of Congress approved August 8, 1846, 'granting certain lands to the Territory of Iowa, to aid in the improvement of the navigation of the Des Moines River in said Territory,' do hereby certify that there has been expended from time to time prior to the date hereof on the improvement of said river, as the work has progressed, and the money has been required, under certain contracts made by the State of Iowa with the Des Moines Navigation & Railroad Company, the sum of three hundred and thirty-two thousand six hundred and thirty-four $\frac{4}{100}$ dollars ($332,634.04), and in consideration of said expenditures on said improvement, and in pursuance of the provisions of the act of Congress approved as aforesaid,

there will be conveyed to said Des Moines Navigation & Railroad Company two hundred and sixty-six thousand one hundred and seven $\frac{23}{100}$ acres (266,107 $\frac{23}{100}$ acres) of the land belonging to said grant, and which have been certified and approved to the State of Iowa under said act for the prosecution of the improvement of said river Des Moines.

" In testimony whereof, I, Ralph P. Lowe, governor of the State of Iowa, have caused the great seal of the State of Iowa to be hereunto affixed, together with my signature.

" [SEAL.]                                  RALPH P. LOWE.
" By the Governor :
       "ELIJAH SELLS, *Secretary of State.*"

And on the 3d of May, 1858, the governor conveyed to the navigation company, by fourteen deeds, the lands referred to.

On September 28, 1889, the present suit was commenced by the filing of the bill in behalf of the United States, in the Circuit Court of the United States for the Northern District of Iowa ; in which bill the complainant prayed that on final hearing a decree might be entered cancelling and setting aside the certificate of the United States made by the Secretary of the Interior, the resolution of settlement passed by the General Assembly of the State of Iowa, and the deeds of the governor to the navigation company, made in pursuance of such settlement, and quieting and confirming plaintiff's title to all the lands. To this bill were made parties defendant the navigation company and several individuals holding title to tracts of land by conveyance from it. The navigation company demurred to the bill ; the other defendants answered. Proofs were taken under the issues presented by the bill and answer ; and on final hearing a decree was entered sustaining the demurrer of the navigation company, and on the merits dismissing the bill. 43 Fed. Rep. 1. From such decree the United States appealed to this court.

*Mr. Attorney General* for the United States, appellant.

This is a suit by the United States to reclaim from the defendants lands conveyed by legislative grant to the State of Iowa upon a trust for the purpose of improving the navigation of the Des Moines River, and received by the State upon that trust, but for which the defendants have conveyances from the State in violation of that trust. Commencing in 1846, the date of the original grant, the subject matter has been one of constant dispute for over forty years. On the one hand, speculators represented by the defendant, the navigation company, have claimed vast tracts of the best land in Iowa under alleged grants from the State. On the other hand, hundreds, perhaps thousands, of hard-working pioneers have settled and made their homes upon these lands. Other railroad companies have claimed them under other grants.

The executive officers of the national government have made a multitude of conflicting rules in reference to them. The legislature of Iowa has passed statutes with reference to them; the executive of Iowa has attempted to dispose of them by administrative acts, and the courts of Iowa have attempted to settle their titles by judicial decisions. This court, in a large number of cases involving collateral issues, has made many decisions, which, as between the parties before the court, are conclusive; but now, for the first time, the party possessed of the original title, the party which made the grant to the State upon the trust, the only party which ever had, or now has, a right to question the action of its trustee in the premises — the United States — comes into court, asserts that the conveyances under which the defendants claim title have been made in violation of its rights, shows that the conditions upon which the trust was created have been violated throughout, and demands a restoration of so much of the property as has not passed into the hands of innocent purchasers without notice.

Such being the case, in presenting the claim of the United States I shall have little to do or to say with reference to the action of any party except the United States; and little to do and little to say with reference to the action of the United States, except as it has spoken and acted through Congress, which was the only branch of the government by which this land could be conveyed.

The sole authoritative action of the United States in the premises, by which title to this property has been or could be conveyed, is found in three acts of Congress, viz.: the act of August 8, 1846, (*ante* 511,) the joint resolution of March 2, 1861, (*ante* 513,) and the act of July 12, 1862, (*ante* 515). The first of these acts was accepted by the legislature of Iowa, January 9, 1847. The State thereby took these lands in trust and could make no conveyance thereof, except according to the terms of the act of 1846. Congress not only never released the lands from the trust, but in the act of 1862, under which the defendants claim, expressly provided that the grant of lands above the fork should be subject to all the terms of the trust in the statutes of 1846.

I. As a trustee, the State of Iowa held these lands just as any other trustee would have held them. It took them not as a sovereign in its sovereign governmental capacity, but as a municipal corporation dealing with property interests and as a trustee to execute the trust reposed in it by the grant. Dillon Mun. Corp. 3d ed. §§ 567–573; *Vidal* v. *Girard*, 2 How. 127; *Mayor of Philadelphia* v. *Elliott*, 3 Rawle, 170; *Perin* v. *Carey*, 24 How. 465; *Girard* v. *Philadelphia*, 7 Wall. 1; *Swann* v. *Lindsey*, 70 Alabama, 507.

Taking the property under said trust, the State, as trustee, could dispose of it only in accordance with the terms of the trust. *Schulenberg* v. *Harriman*, 21 Wall. 44; *Farnsworth* v. *Minnesota & Pacific Railroad*, 92 U. S. 49; *Rice* v. *Railroad Co.*, 1 Black, 358; *Grinnell* v. *Railroad Co.*, 103 U. S. 739; *Wheeler* v. *Walker*, 2 Connecticut, 196; *S. C.* 7 Am. Dec. 264; *Hayden* v. *Stoughton*, 5 Pick. 528.

Upon these authorities it may and will be assumed in this argument that the State of Iowa took the title to the lands covered by the act of 1846, in trust, and that it could not make a title to them by conveyance, except in accordance with the terms of the trust.

II. From August 8, 1846, to March 2, 1861, no further action was taken by Congress with reference to this land grant. A vast amount of negotiations between the executive officers of the general government, the officers of the State of Iowa, and

private citizens, and a vast amount of legislation by the State of Iowa and negotiations and contracts between that State and sundry parties, having or claiming to have an interest in these lands, were had. But all such negotiations, pretended contracts and legislation were utterly void and ineffective so far as the lands in dispute are concerned, (if for no other reason,) because the grant, under the statute of 1846, did not cover an acre of land north of the Raccoon Fork. *Dubuque & Pacific Railroad* v. *Litchfield*, 23 How. 66.

Then came the joint resolution of March 2, 1861, *ante* 513, which brings us to the main point of contest, at least, so far as this argument is concerned. The Des Moines Navigation and Railway Company contends that it is within the scope and meaning of this joint resolution, that, on March 2, 1861, it held the lands in controversy as a *bona fide* purchaser under the State of Iowa. This we deny. Upon this question of *bona fides* the burden both of averment and proof is on the defendants.

So far as the navigation and railway company is concerned, the case was dismissed upon demurrer to the bill, that company being claimant of most of the lands. It is by defendants, of course, conceded that the averments of the bill are to be taken as true, but it is contended that these averments are insufficient to put in issue this question of *bona fides*. To this assertion I answer that the question of *bona fides* is a question of fact; that if it were a law case it would be a question for a jury; and that in a pleading an averment of *bona fides*, or the reverse, is in itself an averment of fact. It may be that, in some cases, upon motion, a naked allegation of *bona fides*, or the reverse, might be required to be made more specific; but as against a denial, or as against a demurrer, it is sufficient as an averment of a fact.

The averments in the bill, admitted by the demurrer, are: that the company did but a very small fraction of the work it pretended to do; that it abandoned the undertaking covered by its contract; that it received, in lands below Raccoon Fork, a sum vastly in excess of any just demand; that, in short, very little expenditure was made upon this great work,

for which the vast land grant was made by Congress, and that for such work as was done the company was paid several times more than the amount to which it was entitled. It further appears by averments in the bill, as well as by the Exhibit A, being the joint resolution of the legislature forming substantially the alleged contract between the State and the company in 1858, that from beginning to end there was no pretence of compliance with the terms and conditions of the trust, as set out in the grant of 1846, but that both this company and the State appear to have treated the act of Congress of 1846 as making a grant to the State, absolute and unrestrained by any conditions whatsoever.

Under these circumstances it seems too plain for argument, first, that this company was not, as matter of fact, a *bona fide* purchaser or holder of these lands, and second, as matter of law, that no party, with notice, receiving a deed from a party holding the title to lands in trust, in violation of the terms of such trust, can be a *bona fide* holder of such lands. Perry on Trusts, 277; Bl. Com. Book II, 337.

The bill further alleges that at the date and passage and approval of said resolution of 1861, and as the foundation and cause of the same, a large number of persons had in good faith bought of the State of Iowa, paying cash therefor, large quantities of land for the purpose of making their homes thereon, and had with such purpose actually taken possession thereof and settled thereon, and were then holding the same; and it was for the purpose of protecting these persons that said resolution of Congress was passed, and they were the persons meant and intended in said resolution, and no others, who are referred to in said resolution as *bona fide* purchasers of the State of Iowa.

To these persons, therefore, who were entitled to protection in the occupation of the lands they had purchased in good faith, and in pursuance of the repeated decisions of the executive officers of the government, and who had improved the lands and made their homes upon them, this resolution could and was intended to apply. But, as matter of law, it is quite immaterial to whom the resolution did apply, for it is very

clear that it did not and could not apply to the navigation company and that is sufficient for the purposes of this case.

III. If, as seems clear, this company took nothing under the joint resolution of March 2, 1861, the next question is, did it take anything under the act of Congress of July 12, 1862?

The legal effect of that act was to convey to the State of Iowa, upon exactly the same terms as were prescribed in the original grant of 1846, the lands within the limits named north of the Raccoon Fork and south of the northern boundary of the State of Iowa, except as those terms are modified in the provision " that the consent of Congress is hereby given to the application of a portion thereof to aid in the construction of the Keokuk, Fort Des Moines and Minnesota Railroad, in accordance with the provisions of the act of the general assembly of the State of Iowa, approved March 22, 1858." As under the act of 1846 the State was a trustee, and could not make a conveyance of an acre of the lands, except in accordance with the provisions of the trust, so, after the enactment of this law, it held the lands above the fork subject to the same limitations and conditions. The effect of those limitations and conditions has already been discussed.

IV. This brings us to the question whether, by reason of estoppels, Iowa statutes or otherwise, the navigation company can claim anything under the grants from the State of 1858 in the land north of the Raccoon Fork. Our contention is, that, aside from the fact that the State held these lands in trust, and could therefore only convey in accordance with the trust, the navigation company can claim nothing under the grants of 1858 for the reason that the grants contained no warranty, and therefore a subsequent title does not inure to the benefit of the navigation company.

There are, however, decisions which uphold the proposition that a conveyance, such as this, being in direct breach of trust, would be void, and therefore, even if accompanied by warranties, would not work a grant by estoppel; but as in this case there are no covenants that question is not material. There is, however, another reason why the navigation company cannot claim these lands, and could not even if the pretended grant

by the State were accompanied by covenants of warranty. An estoppel by deed is operative against the grantor to prevent fraud and injustice. The principle is that a grantor who assumes to convey and warrant property which he has not, if he afterward acquire it, shall not be permitted to assert his title against his grantee, because to do so would be to work a wrong; but this principle would have no application to the Federal government in this case, and the navigation company is in no condition to assert such a principle. The Federal government conveyed this property to the State upon a trust; the navigation company attempted to obtain it from the State through a breach of this trust. Under these circumstances, upon no principle can a grant by estoppel be set up by the navigation company against the government.

Nor is the case of the defendant helped by the Code of Iowa, of which section 1202 reads as follows: "Where a deed purports to convey a greater interest than the grantor was at the time possessed of, any after-acquired interest of such grantor to the extent of that which the deed purports to convey inures to the benefit of the grantee." The defendant can get no benefit from this statute because it does not apply to the State at all. Bacon's Abridgment, tit. Prerogative, 3–5; *United States v. Knight*, 14 Pet. 301, 315; *Dollar Savings Bank v. United States*, 19 Wall. 227, 239; *United States v. Greene*, 4 Mason, 427.

V. But it is objected that this claim is stale; that the United States ought to be barred by its laches; that this suit might have been brought many years ago; that this navigation company has been paying the taxes and expending money on this land, etc. The answers to all this are very plain and easy. First, the claims of the United States are not subject to statutes of limitation, nor can the charge of laches be successfully asserted against the United States. *United States v. The Dalles Military Road Company*, 140 U. S. 599, 632; *United States v. Insley*, 130 U. S. 263, 266. And in the second place, if the suit were by a private citizen, the plea of laches would not be available, because it is the case of an express trust; and until the State of Iowa in some authoritative man-

ner repudiates the trust, the statute of limitations would not begin to run, and the charge of laches would not be well founded. The claim that the defendant has an equity by rea-. son of having expended money in taxes, etc., is fully answered in one of the cases upon which the defendant mainly relies, namely, *Homestead Company* v. *Valley Railroad,* 17 Wall. 153, where parties whose good faith was not challenged had made large expenditures in the payment of taxes, but were denied by this court any equities by reason thereof.

VI. Finally, it is contended that whatever may be the merits of this case they are foreclosed by the adjudications of this court in the large number of decisions already made in collateral cases which are cited by appellees. I think it is not difficult to show that this contention is unfounded, and that there is before the court a broad highway of solid legal principle upon which the court may travel to the conclusion sought by the government, without touching, much less crossing or upsetting, any decision heretofore made by the court. I have carefully examined all the decisions of this court cited by defendants upon this question, and in not one of them is there a sentence that shows that the *bona fides* of the navigation company or of the other defendants as holders of this property has ever been questioned, or the right of the United States to demand an accounting of its trustees, or to assert its title to lands which have been conveyed in violation of the plain terms of the trust under which the title passed from the United States, has ever been raised or considered for a moment. The contest here is not between *bona fide* settlers as against each other, but this litigation is in the interests of *bona fide* settlers against speculators who have appropriated these lands in violation of law and of the principles of common honesty.

VII. The only other question calling for attention is the relation of the appellees, other than the navigation company; and this, I think, presents no difficulty. They claim as innocent *bona fide* purchasers from the navigation company. If, as we think is entirely clear, it is shown that the title of the navigation company is not good, then its grantees cannot succeed except as they show themselves to be *bona fide* purchasers, for

value, and without notice. The burden of proof as to the *bona fides* in this matter is upon these claimants. *Clements* v. *Moore*, 6 Wall. 299; *Haskins* v. *Warren*, 115 Mass. 514; *Nickerson* v. *Meacham*, 5 McCrary, 511; *Peck* v. *Mallams*, 10 N. Y. 509; *Lakin* v. *Sierra Butte Gold Mine Company*, 25 Fed. Rep. 337.

*Mr. C. H. Gatch* for all the appellees except the Des Moines Navigation and Railway Company. *Mr. William Connor* was with him on the brief.

*Mr. Benton J. Hall* for the Des Moines Navigation and Railway Company, appellee. *Mr. Frank T. Brown* was with him on the brief.

*Mr. John Y. Stone* for appellant. *Mr. D. C. Chase* also filed a brief for same.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

Prior to the decision of this court in *Dubuque &c. Railroad Co.* v. *Litchfield*, 23 How. 66, which decision was announced in 1860, it was a disputed question whether the grant extended above the Raccoon Fork. The opinions and rulings of the executive officers of the government were conflicting; and it is not strange that many settled upon these lands in the belief that they were public lands of the United States, and open to settlement. But if they were not in fact open to settlement — if the title legally and fairly passed to the navigation company — no relief from the hardships occasioned by their mistake can be furnished by the courts, whose functions are limited to declaring where, in the face of conflicting claims, the title really rests. We pass, therefore, to the consideration of the matter of title.

It will be observed, in the first place, that there is in this case no question as to the priority of claim. The single question is whether the defendant's title is good as against the

government. If so, it is unquestionably prior to all claims of the settlers, for, as appears, as early as June, 1849, the lands to the northern limits of the State were reserved from settlement and sale by direction of the Land Department; and this reservation was continued in force notwithstanding the subsequent conflicting rulings as to the extent of the grant and the adjudication of this court as to the extent of its limits. The validity of this reservation was sustained in the case of *Wolcott* v. *Des Moines Company,* 5 Wall. 681, decided at December term, 1866. In that case it was held that, even in the absence of a command to that effect in the statute, it was the duty of the officers of the Land Department, immediately upon a grant being made by Congress, to reserve from settlement and sale the lands within the grant; and that, if there was a dispute as to its extent, it was the duty to reserve all lands which, upon either construction, might become necessary to make good the purposes of the grant. This ruling as to the power and duty of the officers of the Land Department has since been followed in many cases. *Bullard* v. *Des Moines & Fort Dodge Railroad,* 122 U. S. 167, and cases cited in the opinion.

As lands properly reserved are not open to settlement or sale, it follows that the lands above Raccoon Fork were at the time of the passage of the resolution of 1861 wholly within the disposing power of Congress; and no rights could have attached, by occupancy or otherwise, which would burden the title, or either legally or equitably affect any grant or disposition which Congress might then see fit to make. By that resolution Congress relinquished to the State all the title of the United States, (and that was a full and absolute title,) to such tracts of land as were then held by *bona fide* purchasers under the state law; and by the act of the succeeding year, the grant was in terms extended to the northern limits of the State, so that all alternate sections above the Raccoon Fork, not theretofore disposed of by the State to *bona fide* purchasers, thereby passed to the State. As the original grant in 1846 was within settled rules of construction a grant *in præsenti,* (*Deseret Salt Company* v. *Tarpey, ante* 241, and cases cited in the opinion;) the act of 1862, which was a mere extension of

the grant, took effect and passed title at once to the State; and the resolution of 1861, which was in terms a relinquishment, also operated as an immediate transfer of title. By the reservation, therefore, full title was retained in the United States; and by the resolution of 1861, and the act of 1862, the same full title passed *eo instanti* to the State.

But if by the resolution title passed to the State, it also at the same time passed through the State to the real beneficiaries of this resolution, to wit, *bona fide* purchasers under the State of Iowa. Section 1202 of the, Code of Iowa, of 1851, reads as follows: "Where a deed purports to convey a greater interest than the grantor was at the time possessed of, any after-acquired interest of such grantor to the extent of that which the deed purports to convey enures to the benefit of the grantee." The deeds made by the State to the navigation company recite that, "the State of Iowa does hereby sell, grant, bargain and convey to the said Des Moines Navigation and Railroad Company the following referred to and described lands, to wit," (describing them,) "to have and hold the above-described lands and each and every parcel thereof, with all the rights, privileges, immunities and appurtenances of whatever nature thereunto belonging." These were deeds purporting to convey a full title. That is the general rule, and such is the import of section 1232, Code of Iowa, 1851, prescribing forms for deeds.

Even if there were no such statute with respect to after-acquired titles, the manifest intent of Congress in the resolution was, not to transfer the title to the State to be by it disposed of as it saw fit, but to the State solely for the benefit of *bona fide* purchasers. The inference from the language, standing by itself, is made certain by the act of 1862, where it refers to the lands covered by this resolution as lands "released by the United States to the grantees of the State of Iowa, under the joint resolution of March 2, 1862." This is an interpretation by Congress of the scope of that resolution, and shows to whom Congress intended that the lands should pass.

Was the navigation company a *bona fide* purchaser under the State? Of course if it was, the other defendants who

hold under it also were. It is claimed by the appellant that the *bona fide* purchasers referred to were certain parties who had bought portions of these lands from the State of Iowa, paying cash therefor, for the purpose of making homes, and who had taken possession thereof and were then occupying the same. But the term "*bona fide* purchaser" has a well-settled meaning in the law. It does not require settlement or occupancy. Any one is a *bona fide* purchaser who buys in good faith and pays value. To limit the term as here used to settlers is to interpolate into the statute a restriction which neither the language nor the surrounding circumstances justify. The term itself, as stated, has no such restricted meaning; and while it may be that there were individuals holding tracts which they had separately settled on and paid for, yet it was also true that the great body of the lands had been conveyed to the navigation company in payment for work done on the Des Moines improvement. This was a well-known fact; and if Congress had intended to distinguish between settlers and other purchasers, it would not have used language whose well-understood meaning included both. If anything can be drawn from the debates in Congress at the time of the passage of this resolution, it sustains this construction. As appears from the Senate proceedings, when the resolution was pending, the fact that a large portion of these lands had been conveyed to the navigation company for work done on the improvement, was stated, and an attempt was made to limit the relinquishment to lands "by the said State sold to actual settlers." Instead of that, the words now used were inserted, to wit, "*bona fide* purchasers under the State of Iowa." Congressional Globe, part 2, 2d Sess. 36th Congress, 1130 to 1133. Independently, however, of any inference from these Congressional proceedings, there can be no doubt that a party doing work under a contract with the State, making a settlement and receiving a conveyance of these lands in payment for that work, is a *bona fide* purchaser. If so, this cause of action fails, and the bill must be dismissed.

But the case does not rest here. The title to these lands has often been brought in question in cases determined by this

court; and its uniform ruling has been in favor of the validity of the title of the navigation company. A review of some of these cases will be instructive. In *Wolcott* v. *Des Moines Company, supra,* it appeared that Wolcott had purchased from the navigation company, the principal defendant in this case, a half section of land above the Raccoon Fork, and received a warranty deed therefor. On the decision in *Dubuque & Pacific Railroad* v. *Litchfield, supra,* that the grant extended only to the Raccoon Fork, he sued the navigation company for breach of covenant, alleging that the title to the tract sold had failed. This court affirmed the judgment of the Circuit Court against him. After referring to its decision in respect to the extent of the grant of 1846, it quoted the resolution of 1861 and the act of 1862, and added: "If the case stopped here it would be very clear that the plaintiff could not recover; for, although the State possessed no title to the lot in dispute at the time of the conveyance to the Des Moines Navigation and Railroad Company, yet, having an after-acquired title by the act of Congress, it would enure to the benefit of the grantees, and so in respect to their conveyance to the plaintiff. This is in accordance with the laws of the State of Iowa." It then noticed the contention of the plaintiff, that the title to this tract did not pass to the navigation company by this later legislation, because prior thereto, and on May 15, 1856, Congress had made a grant to the State of six alternate sections on each side of certain proposed railroads, to aid in their construction. The tract was within the limits of this grant, but the court held that the title to it did not pass thereby, because of the previous reservation made in 1849, the grant by its terms excepting from its operation all lands reserved by "any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any objects of internal improvements, or for any purpose whatsoever." It will be seen that this decision not only determined the validity and scope of the reservation, but also interpreted the effect of the resolution, as operating to transfer full title to the navigation company.

In 1873, the cases of *Williams* v. *Baker* and *Cedar Rapids Railroad Co.* v. *Des Moines Navigation Co.,* 17 Wall. 144, and

*Homestead Company* v. *Valley Railroad*, 17 Wall. 153, were decided. The first two cases were disposed of by one opinion. Both were suits to quiet title. One side claimed under the river grant and the other under the railroad grant of 1856. Decrees in favor of the river grant were sustained. In the opinion, the court noticed the long contest as to the scope of the original grant, and the final determination thereof, in the case of *Railroad Company* v. *Litchfield*. It then observed: "This decision was received as a final settlement of the long contested question of the extent of the grant. But it left the State of Iowa, which had made engagements on the faith of the lands certified to her, in an embarrassed condition, and it destroyed the title of the navigation company to lands of the value of hundreds of thousands. of dollars, which it had received from the State for money, labor and material actually expended and furnished. What was also equally to be regretted was, that many persons, purchasers for value from the State or the navigation company, found their supposed title an invalid one." And after referring to the legislation of 1861 and 1862, it added: "This legislative history of the title of the State of Iowa, and of those to whom she had conveyed the lands certified to her by the Secretary of the Interior as a part of the grant of 1846, including among her grantees the Des Moines Navigation and Railroad Company, needs no gloss or criticism to show that the title of the State and her grantees is perfect, unless impaired or defeated by some other and extrinsic matter which would have that effect;" and closed the opinion in these words : " We, therefore, reaffirm, first, that neither the State of Iowa, nor the railroad companies, for whose benefit the grant of 1856 was made, took any title by that act to the lands then claimed to belong to the Des Moines river grant of 1846 ; and, second, that by the joint resolution of 1861, and the act of 1862, the State of Iowa did receive the title for the use of those to whom she had sold them as part of that grant, and for such other purposes as had become proper under that grant."

In the third case, which was also a contest between a claimant under the railroad grant and parties claiming under the river

grant, the validity of the latter was affirmed, and in its opinion the court said: "It is, therefore, no longer an open question that neither the State of Iowa nor the railroad companies, for whose benefit the grant of 1856 was made, took any title by that act to the lands then claimed to belong to the Des Moines River grant of 1846, and that the joint resolution of 2d of March, 1861, and the act of 12th of July, 1862, transferred the title from the United States and vested it in the State of Iowa for the use of its grantees under the river grant."

Again, in 1879, the question of this grant came before this court in *Wolsey* v. *Chapman*, 101 U. S. 755, 771. In that case the claim adverse to the river grant originated in this way. On September 4, 1841, Congress passed an act, 5 Stat. 453, c. 16, by the eighth section of which there was granted to each State 500,000 acres of land for purposes of internal improvement. By the constitution of Iowa, under which the State was admitted, this grant was appropriated to the use of common schools, (Constitution of Iowa, 1846, Article 9, "School Funds and Schools," section 3,) and this appropriation was assented to by Congress by a special act. 9 Stat. 349. On July 20, 1850, the agent of the State having charge of the school lands selected the particular tract in controversy as a part of this school grant; and thereafter, and in 1853, the appropriate proceedings being had, a patent was issued by the State to Wolsey. The grant of 1841 was one which required selection, and so no rights accrued to the State to this tract under such grant until the selection on July 20, 1850, but that, as we have seen, was several months after the lands had been reserved for the river grant. The court, in an elaborate opinion by Chief Justice Waite, reviewed all the legislation and the previous decisions of the court, and reaffirmed those decisions. The deed from the State to the navigation company, under which Chapman claimed, being subsequent to the patent from the State to Wolsey, it was contended that the former could not question the title thus previously conveyed. Upon this matter the court said: "Of this we entertain no doubt. If the State had no title when the patent issued to Wolsey, he

took nothing by the grant. No question of estoppel by warranty rises, neither does the after-acquired title enure to the benefit of Wolsey, because when the United States made the grant in 1861 it was for the benefit of *bona fide* purchasers from the State, under the grant of 1846. This is evident as well from the tenor of the joint resolution of 1861 as from the act of 1862. The relinquishment under the joint resolution is of all the title which the United States retained in the tracts of land above the Raccoon Fork, 'which have been certified to said State improperly by the Department of the Interior as part of the grant by the act of Congress approved August 8, 1846, and which is now held by *bona fide* purchasers under the State of Iowa;' and by the act of 1862 the lands are in terms to be held and applied in accordance with the provisions of the original grant. This legislation, being in *pari materia*, is to be construed together, and manifests most unmistakably an intention on the part of Congress to put the State and *bona fide* purchasers from the State just where they would be if the original act had itself granted all that was finally given for the river improvement. The original grant contemplated sales by the State in execution of the trust created, and the *bona fide* purchasers referred to must have been purchasers at such sales. This being so, the grant when finally made enured to the benefit of Chapman rather than Wolsey."

At the same term the case of *Litchfield* v. *County of Webster* was decided, 101 U. S. 773, 775. The question in that case was at what time the title to these lands passed from the United States, and the lands became subject to taxation. In disposing of that question, the Chief Justice, speaking for the court, observed: "We think, however, that, for the year 1862 and thereafter, they were taxable. By the joint resolution, Congress relinquished all the title the United States then retained to the lands which had before that time been certified by the Department of the Interior as part of the river grant, and which were held by *bona fide* purchasers under the State. No further conveyance was necessary to complete the transfer, and the description was sufficient to identify the property. The title thus relinquished enured at once to the benefit of the

purchasers for whose use the relinquishment was made. All the lands involved in this suit had been certified, and Litchfield, or those under whom he claims, were *bona fide* purchasers from the State."

Again, in 1883, the case of *Dubuque & Sioux City Railroad* v. *Des Moines Valley Railroad,* 109 U. S. 329, came to this court on error to the Supreme Court of the State of Iowa. This was an action to recover lands and quiet title, and in which the parties respectively claimed under the railroad grant of 1856 and the river grant; and, again, the Chief Justice delivered the opinion of the court, and in it said: "The following are no longer open questions in this court. . . . That the act of July 12, 1862, c. 161, 12 Stat. 543, 'transferred the title from the United States and vested it in the State of Iowa, for the use of its grantees under the river grant.' *Wolcott* v. *Des Moines Company,* 5 Wall. 681; *Williams* v. *Baker,* 17 Wall. 144; *Homestead Company* v. *The Valley Railroad Company,* 17 Wall. 153; *Wolsey* v. *Chapman,* 101 U. S. 755, 767."

Still later, and in 1886, another attempt was made to disturb the title held under the river grant in the case of *Bullard* v. *Des Moines & Fort Dodge Railroad,* 122 U. S. 167, which also came here on error to the Supreme Court of the State of Iowa. The contention in that case in behalf of the plaintiff in error was that the resolution of 1861, which relinquished to the State the title to lands held by *bona fide* purchasers under it, operated to terminate the reservation from sale made by the Land Department for the benefit of the river grant, and thus left all lands above the Raccoon Fork not then held by *bona fide* purchasers open to settlement and free for the attaching of any other grant from that time and up to the act of 1862, which in terms extended the river grant to the northern limits of the State, and, of course, included all lands, whether held by *bona fide* purchasers or otherwise. But this court sustained the decision of the Supreme Court of Iowa, and ruled that the reservation from sale made by the Land Department was not terminated by the resolution of 1861, but continued in force until the act of 1862.

Such have been the decisions of the court in respect to this grant and titles, decisions running through twenty-five years, all affirming the same thing, and all without dissent. It would seem, if the decisions of this court amount to anything, that the title of the navigation company to these lands was impregnable. Indeed, the emphatic language more than once used, as quoted above, appears like a protest against any further assault upon that title.

Nor has this line of decisions been confined to this court. It runs through the reports of the Supreme Court of Iowa. In addition to the two cases, heretofore referred to, coming from that court to this, and in which its decisions were sustained, may be noticed the following : *Bellows* v. *Todd*, twice before that court, and reported in 34 Iowa, 18 and 39 Iowa, 209. This was an action of ejectment brought by Bellows, holding under the navigation company, against Todd, claiming to have settled upon the premises under the preëmption and homestead laws of the United States in 1860. On the first trial the court refused to give the following instruction : "If the jury find from the evidence that the lands in controversy were certified to the State of Iowa in 1853, under the act of Congress of 8th August, 1846, and that the same have been conveyed by the State of Iowa to the Des Moines Navigation and Railroad Company, and by said company to plaintiff's grantors, and by them to the plaintiff in this action, then the plaintiff is entitled to recover." When the case came before the Supreme Court, (34 Iowa,) the refusal to give this instruction was adjudged error, and the case remanded for a new trial. On the second trial the plaintiff requested the following instruction : "The plaintiff in this action claims title to the lands described in his petition under conveyances from the grantees of the Des Moines Navigation and Railroad Company, and the defendant, as one ground of his defence, alleges that he has been in the continuous occupation and possession of said land for ten years prior to the commencement of this action, and that by reason of such occupation and possession his title is superior and paramount to that of the plaintiff; but if the jury find from the evidence that this land was certified

to the State of Iowa under the act of Congress of August 8, 1846, and has been conveyed by the State to the Des Moines Navigation and Railroad Company, under which plaintiff holds, then the State having acquired title to said land by the joint resolution of Congress of March 2, 1861, the title of the State, so acquired, enured to the benefit of said company and its grantees and the plaintiff, and if this action was commenced within ten years from the date of the passage of said joint resolution, then the plaintiff is entitled to recover in this action notwithstanding the alleged occupation and possession of defendant," which was refused ; and in 39 Iowa the refusal to give this instruction was adjudged error, and the judgment reversed and the case remanded. The significance of this instruction is apparent, inasmuch as the action was commenced on May 19, 1870, less than ten years from the resolution of March, 1861. In its opinion in this last case the court observes "that the title which the State acquired under the resolution of March 2, 1861, enured to the benefit of the Des Moines Navigation Company and its grantees, under the circumstances set forth in the instruction, is elemental. Revision, § 2210 ; Code, § 1931."

In addition, there is a series of cases of which *Stryker* v. *Polk County,* 22 Iowa, 131; *Litchfield* v. *Hamilton County,* 40 Iowa, 66 ; and *Goodnow* v. *Wells,* 67 Iowa, 654, are examples, in which it was held that these lands were subject to taxation for the year 1861. Of course, they could not be subject to taxation unless by the resolution the title had passed not simply from the United States, but also through the State to its grantees; and repeatedly, in different ways, is it asserted in the opinions in these cases that the title had so passed. We have thus a concurrence of opinion on the part of the Supreme Court of Iowa and this court for a quarter of a century in favor of the validity of the title acquired by the navigation company. It would seem as though the period of rest as to this question of title ought by this time to have been reached.

But the government is the complainant, induced doubtless to bring this suit by the act of the legislature of March 28, 1888, which purports to relinquish for the State its trust and

to reconvey to the United States all its right and title to these lands, as well as by the urgent appeals of the settlers, and the claim is, that its presence as a party introduces new questions into the litigation, questions not at all affected by the prior decisions. It is the original grantor, and its contention is that while the title of its grantee may be unassailable by other persons, it has the right to challenge it because the grant was made in trust for a specific purpose, and that trust has not been properly executed, nor the lands appropriated to the purposes thereof. That the proposition of law which underlies this claim is correct, cannot be doubted. The grantor of lands conveyed in trust may be the only party with power to complain of the breach of that trust, or on account of such breach to challenge the title in the hands of the trustee or others holding under him; and the title conveyed, voidable alone at its instance, may be good as against all the world besides.

Before, however, examining the applicability of this proposition of law to the case at hand, one or two preliminary thoughts naturally arrest the attention. There has been long delay in presenting this claim. A third of a century has passed since the State conveyed to the navigation company, and more than a quarter of a century since Congress relinquished and granted to the State the title to these lands. During that time there have been marvellous changes in the population, the industries, the business interests of the State; legislatures and courts have been busy determining rights and establishing relations based upon the vesting of title in the navigation company. A proposition to destroy this title, and to put at naught all that has been accomplished in respect thereto and based thereon during these years, is one which may well make us pause. While it is undoubtedly true that when the government is the real party in interest, and is proceeding simply to assert its own rights and recover its own property, there can be no defence on the ground of laches or limitation, *United States* v. *Nashville, Chattanooga &c. Railway,* 118 U. S. 120, 125; *United States* v. *Insley,* 130 U. S. 263; yet it has also been decided that where the United States is only a formal party, and the suit is brought in its name to

enforce the rights of individuals, and no interest of the government is involved, the defence of laches and limitation will be sustained as though the government was out of the case, and the litigation was carried on in name, as in fact, for the benefit of private parties. *United States* v. *Beebe*, 127 U. S. 338. In that case a bill was brought by the United States to set aside certain patents issued to one Roswell Beebe, and the charge was that Beebe by fraudulent practices obtained the patents. But it also appeared that certain individuals claimed to have equitable titles to the land by virtue of prior locations; and that the effect of a decree cancelling the patents would be simply to enable such other parties to perfect their equitable titles. Forty-five years had elapsed since the patents were issued, and this court declining to enter into any inquiry as to whether the patents were fraudulently obtained, ruled that the defence of laches was complete, because the government was only a nominal and not the real party in interest.

The history of the present litigation shows that the long contest has been between the navigation company and its grantees on the one side and settlers claiming the right to preemption or homestead, or parties claiming under the railroad grants, on the other. The bill alleges:

"And complainant further alleges and charges that, at the time of the said settlement of 1858, and at all other times theretofore, there existed in the constitution of the State of Iowa, from the time of the admission of said State into the Union in 1846, a provision in the words following, to wit, 'The general assembly shall not locate any of the public lands which have been or may be granted by Congress to this State, and the location of which may be given to the general assembly, upon lands actually settled, without the consent of the occupant. The extent of the claim of any occupant so exempted shall not exceed three hundred and twenty acres.' That at the time of the pretended settlement, so made between the State of Iowa and the said navigation company, and at all times when the State has attempted to dispose of lands covered by the grant of 1846 and the said act of 1862, which are in controversy in this suit, said lands were occupied by

persons who had settled upon them in tracts of not more than 320 acres to each person, in the belief that they were open to location, settlement, preëmption and purchase under the land laws of the United States, and at said time they were occupying said lands in tracts not larger than 320 acres to each, and the said State of Iowa was thereby and therefore prohibited under said constitutional provision from disposing or attempting to dispose of any of the lands in controversy, since none of said persons so occupying said lands consented to any sale or disposition of them whatever."

And in the brief of the Attorney General it is stated that "the contest here is not between *bona fide* settlers as against each other, but this litigation is in the interests of *bona fide* settlers against speculators who have appropriated these lands in violation of law and of the principles of common honesty."

The district judge, deciding this case in the court below, said: "Any purpose to call in question the title of parties in actual possession, holding under the State or the navigation company, is expressly disclaimed in the bill, it being averred that the benefit of a decree in favor of complainant is sought only as to such lands as are now actually occupied by settlers who do not hold title under the State or the navigation company, the same amounting to 109,057 acres." And, after deciding the legal question in favor of the navigation company, he goes on to discuss and suggest what in equity and justice the government should do for the benefit of these settlers. We should be closing our eyes to manifest facts if we did not perceive that the government was only a nominal party, whose aid was sought to destroy the title of the navigation company and its grantees, in order to enable the settlers to perfect their titles, initiated by settlement and occupancy; and in that event, the delay of thirty years is such a delay as a court of equity forbids. At any rate, it makes most apt the observation of Mr. Justice Miller, speaking for the court in the case of *United States* v. *Throckmorton*, 98 U. S. 61, 64, in which case a bill had been filed to set aside a decree rendered more than twenty years before: "It is true that the United States is not bound by the statute of limitations, as an indi-

vidual would be. And we have not recited any of the foregoing matters found in the bill as sufficient of itself to prevent relief in a case otherwise properly cognizable in equity. But we think these are good reasons why a bill which seeks under these circumstances to annul a decree thus surrounded by every presumption which should give it support, shall present on its face a clear and unquestionable ground on which the jurisdiction it invokes can rest."

Even if this be regarded as a bill brought by the United States simply to protect its own interests, and recover its own property, still it is well settled that where relief can be granted only by setting aside a grant, a patent or other evidence of title, issued by the government, in the orderly administration of the affairs of the Land Department, the evidence in support must be clear, strong and satisfactory. Muniments of title issued by the government are not to be lightly destroyed. *Kansas City, Lawrence &c. Railroad* v. *Attorney General*, 118 U. S. 682; *Maxwell Land Grant Case*, 121 U. S. 325, 381; *Colorado Coal Company* v. *United States*, 123 U. S. 307. In the second of these cases Mr. Justice Miller, speaking for the court, said: "It is not to be admitted that the titles by which so much property in this country and so many rights are held, purporting to emanate from the authoritative action of the officers of the government, and, as in this case, under the seal and signature of the President of the United States himself, shall be dependent upon the hazard of successful resistance to the whims and caprices of every person who chooses to attack them in a court of justice; but it should be well understood that only that class of evidence which commands respect, and that amount of it which produces conviction, shall make such an attempt successful."

Returning now to the special contention on the part of the government: It is scarcely necessary to determine whether the trust was one following the lands, or merely in the proceeds of the sales of the lands, and whose faithful performance is a question only between the United States and the State, as was finally determined to be the state of the trust created by the "swamp land" grant. *Mills County* v. *Railroad Companies,*

107 U. S. 557. We pass rather to inquire in what manner
the State performed the duties or trust imposed by the accept-
ance of this grant, in so far as such performance affects the
title to the lands in controversy. The general purpose of the
grant was to aid the Territory or State in improving the navi-
gation of the Des Moines River. The second section of the
act prescribed the conditions under which the Territory or
State might sell the lands, as follows:

"SEC. 2. And be it further enacted, That the lands hereby
granted shall not be conveyed or disposed of by said Territory,
nor by the State to be formed out of the same, except as said
improvements shall progress; that is, the said Territory or
State may sell so much of said lands as shall produce the sum
of thirty thousand dollars, and then the sales shall cease, until
the governor of said Territory or State shall certify the fact
to the President of the United States that one-half of said
sum has been expended upon said improvement, when the said
Territory or State may sell and convey a quantity of the res-
idue of said lands, sufficient to replace the amount expended,
and thus the sales shall progress as the proceeds thereof shall
be expended, and the fact of such expenditure shall be certi-
fied as aforesaid."

The third section declared that the price should not be less
than the minimum price of other public lands. So that all
that the act provided for was, that the State should appro-
priate the lands to the improvement of the river; that it
should make no sales at less than $1.25 per acre; and that its
sales should not anticipate its expenditures by more than
$30,000. Now, it is not pretended that the State appropri-
ated the lands to any other purpose, or that the price at which
it sold was less than $1.25 per acre. The contract between it
and the navigation company provided for conveyances only
as the work progressed, and money was expended by the
company; and the settlement proposed by the legislature and
accepted by the company, and the certificate made by the gov-
ernor to the President, showed that the navigation company
had expended money enough to justify the conveyance of all
the lands which were in fact conveyed. On the face of the

transaction, therefore, the duties imposed by the trust were exactly and properly performed, and the title of the navigation company passed to it in strict compliance with the very letter of the statute. But it is earnestly contended that the navigation company was not a *bona fide* purchaser; that while it claimed to have expended $330,000 on the improvement, in truth it had not expended half that amount; that by means of its false representations, and by threats of bringing suit against the State and obtaining damages against it, it induced the legislature to pass the resolution of 1858, offering terms of settlement; that the work of improving the river was unfinished, not more than one-tenth of the work necessary therefor having been done; and that the State has wholly abandoned the undertaking.

With respect to the last two allegations it is not perceived how, if true, they can affect the title of the navigation company to lands deeded by the State to it in payment of work done. Surely the title to lands which the State conveyed at the inception of the undertaking, either for cash or for work done thereon, cannot fail because the State failed to complete the improvement. No land could have been sold if the purchaser's title had depended upon such a condition.

If we examine the testimony, there is nothing in it worthy of mention tending to impeach the *bona fides* of the transaction between the State and the navigation company. Only one witness was offered by the plaintiff to prove the amount of work done by the navigation company, and the influences by which the action of the legislature was induced, and his testimony carries on its face abundant evidences of its own unworthiness. In the face of the deliberate proceedings of the legislature and the executive officers of the State, in respect to a matter of public interest, open to inspection and of common knowledge, something more than the extravagant and improbable statements of one witness, made thirty years after the event, is necessary to overthrow the settlement. Indeed, counsel for the government make slight reference to this testimony; but rest their case upon the allegations of the bill, which as against the principal defendant, the navigation company,

were admitted by demurrer.    It is urged that there is an
express averment that the navigation company and its gran-
tees are not and never were *bona fide* purchasers of the lands,
or any part thereof.    But such a general averment, though
repeated once or twice,. is to be taken as qualified and limited
by the specific facts set forth to show wherein the transaction
between the State and the navigation company was fraudu-
lent.    Where a bill sets out a series of facts constituting a
transaction between two parties, a demurrer admits the truth
of those facts and all reasonable inferences to be drawn there-
from, but not the conclusion which the pleader has seen fit to
aver.    And the fact which stands out conspicuously, is the
resolution proposing settlement which passed the legislature
of the State of Iowa in March, 1858.    That act is beyond
challenge.    The knowledge and good faith of a legislature are
not open to question.    It is conclusively presumed that a legis-
lature acts with full knowledge, and in good faith.    It is true
the bill alleges that its passage was induced by the navigation
company, by false representations and threats of suits ; but
such an allegation amounts to nothing.    In Cooley's Constitu-
tional Limitations, (5th ed. 222,) the author, citing several
cases, observes: " From what examination has been given to
this subject, it appears that whether a statute is constitutional
or not is always a question · of power; that is, a question
whether the legislature in the particular case, in respect to the
subject matter of the act, the manner in which its object is to
be accomplished and the mode of enacting it, has kept within
the constitutional limits and observed the constitutional condi-
tions.    In any case in which this question is answered in the
affirmative, the courts are not at liberty to inquire into the
proper exercise of the power.    They must assume that legisla-
tive discretion has been properly exercised.    If evidence was
required, it must be supposed that it was before the legislature
when the act was passed ; and if any special finding was re-
quired to warrant the passage of the special act, it would seem
that the passage of the act itself might be held to be equiva-
lent to such finding.    And, although it ·has sometimes been
urged at the bar that the courts ought to inquire into the

motives of the legislature where fraud and corruption were alleged, and annul their action if the allegations were established, the argument has in no case been acceded to by the judiciary, and they have never allowed the inquiry to be entered upon." See also *Fletcher* v. *Peck,* 6 Cranch, 87; *Ex parte McCardle,* 7 Wall. 506; *Doyle* v. *Continental Insurance Co.,* 94 U. S. 535; *Powell* v. *Pennsylvania,* 127 U. S. 678. And in this case the circumstances surrounding the transaction preclude the idea of misconduct or ignorance on the part of the legislature. The threat of suit, when the State could not be sued except at its own will, could not have been very persuasive. The work done by the navigation company was open to inspection. It was done along the line of the principal river in the State. It was in fact made a matter of examination and report; and, while the amount expended by the navigation company might not have been known to the exact dollar, yet, in a general way, the cost of what had been done could easily have been ascertained, and must have been known. But if no lack of good faith can be imputed to the State, the party making the offer of settlement, does it not follow necessarily that none can be imputed to the navigation company, the party accepting the offer; for how can fraud be imputed to one who simply accepts terms of settlement voluntarily offered by another? And if this settlement was made in good faith and without fraud, is it not clear that the navigation company, taking the lands which the State offered in payment for the work which it had done, took those lands as a *bóna fide* purchaser, and, therefore, comes within the letter and spirit of the resolution of 1861? And here the significance of this resolution is evident. It was passed by Congress after the settlement, proposed by the Iowa legislature in 1858, had been accepted by the navigation company, and deeds had passed in accordance therewith. Its passage imports full knowledge of antecedent facts upon which it is based. In *Powell* v. *Pennsylvania,* 127 U. S. 678, 686, referring to action had by the legislature of the State, this court said: "The legislature of Pennsylvania, upon the fullest investigation as we must conclusively presume, and upon reasonable grounds,

as must be assumed from the record," etc. So, Congress, by this resolution of 1861, knowing that this settlement had been offered by the State of Iowa and accepted by the navigation company, knowing that such act on the part of the legislature conclusively implied full knowledge and good faith, and that an acceptance of such offered settlement by the navigation company also implied good faith, knowing also that the conveyances made under this settlement embraced the major portion of the lands, must be assumed to have approved such settlement and intended to relinquish to the navigation company the title supposed to have been conveyed by the settlement and deeds. Surely it cannot be, that when it knew the import and implication of the legislative act, Congress thought to repudiate it, or invite investigation into a matter which otherwise stood foreclosed of all inquiry. As its own acts were free from imputation, it knew that the acts of the legislature of the State of Iowa were also free from imputation, and that a settlement which that legislature had offered could not be challenged for fraud; and with that knowledge it confirmed the title which the legislature of Iowa had attempted to convey. Surely under those circumstances the courts are not at liberty to probe the matters surrounding this settlement, to see if some party did not misrepresent the facts, and utter falsehoods. So, if we narrow the inquiry to the mere language of the bill, in view of all the facts disclosed therein, and of those legislative and judicial proceedings which are matters of common knowledge and need not be averred, it is evident that the government has not made out its case. And, if we broaden the inquiry to all the facts disclosed by the testimony, it is clear beyond doubt that the navigation company was a *bona fide* purchaser within the meaning of the resolution of 1861, and intended as a beneficiary thereunder.

It follows from these conclusions that there was no error in the ruling of the Circuit Court dismissing the bill, and its decree is

*Affirmed.*