**BAKER et al. v. UNITED STATES et al.**

Circuit Court of Appeals, First Circuit.
July 30, 1928.

No. 2215.

1. **Constitutional law** ⬢⟹70(3)—**Judiciary cannot go behind act of Congress, to show motives of Legislature, or from whence it derives its knowledge.**

The judiciary cannot go behind an act of Congress, to show motives of Legislature, or from whence it derives its knowledge.

2. **Evidence** ⬢⟹83(1)—**When Executive Department has passed on prerequisites of act of Congress, there is presumption of regularity of such administrative acts.**

When Executive Department of government has passed on prerequisites of an act of Congress, there is a presumption of regularity of such administrative acts by Executive Department.

3. **Constitutional law** ⬢⟹70(3)—**It is conclusively presumed that Congress, in passing act authorizing leasing of naval lands, acted with knowledge and in good faith.**

It is to be conclusively presumed that Congress, in passing an act authorizing the Secretary of the Navy to lease land under naval control in Porto Rico, not otherwise required for naval purposes, acted with knowledge of facts and in good faith.

4. **Constitutional law** ⬢⟹70(3)—**Decision of Congress is final regarding what constitutes public policy in all matters confided to it by Constitution or law.**

Decision of Congress is final word in reference to what constitutes public policy in all matters confided to it by Constitution or law.

5. **Constitutional law** ⬢⟹70(1)—**Decision of Congress is final regarding policy of allowing naval officer to accept anything beyond his salary.**

Decision of Congress is final as to policy of allowing naval officer to accept provision for a residence on land under naval control in Porto Rico, or to accept anything beyond his ordinary salary.

6. **United States** ⬢⟹39(1)—**Special act, authorizing lease of naval lands to naval officer, held to show intent of Congress to make exception to general statute providing that officers, whose salaries are fixed by law, shall receive no additional allowance.**

In passing special act authorizing lease of land under naval control in Porto Rico to naval officer for residence purposes, Congress must be presumed to have had in contemplation any general statute providing that officers whose salaries are fixed by law shall receive no additional pay, extra allowance, or compensation in any form, and such specific act must be held to show intent to make exception to general statute.

7. **Constitutional law** ⬢⟹70(1)—**Exercise of discretion by Congress regarding disposition of public property cannot be questioned by courts.**

Exercise of discretion by Congress relating to disposition of public property, consisting of land under naval control in Porto Rico, by authorizing lease of part of such lands to naval officer for residence purposes, cannot be questioned by courts.

8. **United States** ⬢⟹66—**Lease to naval officer of land under naval control for residence purposes, in consideration for services and transfer of land for radio station, held not obtained by fraud.**

Lease to naval officer of land under naval control in Porto Rico for residence purposes of officer, in consideration for transfer of land for distant control radio station, and in recognition of services rendered in wars by officer and other services, *held* not shown by evidence to have been obtained by fraud, and government was not entitled to have lease canceled.

Appeal from the District Court of the United States for the District of Porto Rico; Emilio Del Toro, Judge.

Suit by the United States against Virgil Baker and others to cancel a lease, in which the People of Porto Rico intervened. From a decree for complainant, defendants appeal. Reversed and remanded, with instructions.

Nelson Gammans, of New York City (Frank Davis, Jr., Seiforde M. Stellwagen, William D. Harris, and William J. Neale, all of Washington, D. C., on the brief), for appellants.

William Cattron Rigby, of Washington, D. C. (John A. Smith, of Chicago, Ill., John L. Gay, U. S. Atty., of San Juan, Porto Rico, George C. Butte, Atty. Gen., of Porto Rico, John A. Hull, of Washington, D. C., J. A. Lopez Acosta, of San Juan, Porto Rico, and James R. Beverley, Asst. Atty. Gen., on the brief), for appellees.

Before BINGHAM and JOHNSON, Circuit Judges, and HALE, District Judge.

HALE, District Judge. This suit in equity is before us on appeal from a decree of the United States District Court for Porto Rico, December 23, 1926, sustaining the complainant's bill of complaint and ordering a cancellation of the lease involved in the suit.

The bill of complaint states its case substantially as follows:

At all times mentioned in the bill the defendant Baker was an officer in the United States Navy, in active service in charge of the naval radio station at San Juan, Porto Rico; or a retired officer of the United States Navy residing in Porto Rico. On and prior to the 18th day of March, 1919, the United States was the owner of a tract of land within the military reservation of San Juan, at Porto Rico, then in the possession and under the control of the War Department, now known as the San Geronimo Naval Reserva-

tion. On the date last named, pursuant to a request of the Navy Department, and relying upon the representations of the defendant that permanent use of the reservation by the Navy Department was necessary for the purposes of the Navy Department, the Secretary of War leased the reservation to the Navy Department for 99 years for the operation thereon of a radio telegraph station and for other naval purposes. On December 15, 1919, this tract was formally transferred to the Navy Department. No use was made of this property so transferred to the Navy Department for any naval purposes, except as a residence for Virgil Baker, the defendant, and on the 26th day of August, 1919, upon his request, he being then in charge of the naval radio station at San Juan, Porto Rico, the acting Secretary of the Navy leased to him for a term of five years a portion of the reservation, describing same by metes and bounds. This lease was given to the defendant upon the consideration of his representation that the conduct of the radio station required him to live close by, and that his residence at San Geronimo was necessary for the proper administration of the station, and upon his guaranty immediately to erect a concrete residence upon the property, which would provide an additional set of officers' quarters, and for the purpose of improving the sanitary conditions of the site, and securing other improvements by him at a cost of over $12,000, and the erection of such improvements, and the payment of $1.

The residence has not been erected, the lease was procured by the defendant upon false representations, and the terms and conditions of the transfer thereafter prescribed by Congress have not been performed by either the defendant Baker or his wife, Stella May Baker, who is joined as a defendant in the suit.

On October 27, 1919, the defendant Baker requested authority from the Navy Department to obtain title to a site for a distant control radio station, which he advised could be had in exchange for a small part of the San Geronimo Naval Reservation, consisting of low marshy land not worth more than $2,400, and unsuited for naval use, and that complete title could be secured to 9 acres of land already selected as a site for the distant control station and for necessary perpetual easements. On November 6, 1919, acting in behalf of the Navy Department of the United States, and in reliance upon Baker's representation, and without disclosing any purpose to secure title to the property in his own name as a third party, the defendant entered into an option contract with the Loiza Sugar Company, securing for the Navy Department for a period of six months the right of purchase for $200 certain described parcels of land in the municipality of Loiza on the island of Porto Rico, describing said parcels No. 1 and No. 2. The option provided that the deed of conveyance should contain a stipulation that the said parcels and easements should be reconveyed to the sugar company for $200 whenever the wireless station to be constructed should be abandoned, as appears from a contract made a part of the bill of complaint.

On January 9, 1920, contrary to the option, and contrary to his instructions to acquire full title to the parcels, and in disregard of his obligations as an officer and of his duty as an agent of the United States, the defendant procured the transfer to himself of the two parcels of land, with certain conditions set forth in the bill of complaint; all the conditions, except the one requiring a transfer to the Navy Department, were unauthorized and contrary to law and public policy. In order to secure from the Navy Department a transfer of title to him of a part of the San Geronimo Military Reservation described in the lease of August 26, 1919, the defendant falsely reported to the Navy Department that he had obtained full title to two adjoining tracts of land containing a total of 9 acres, selected as a site for a distant control radio station, with easements covering an area necessary for laying the underground receiving system as contained in a circle with a radius of 2,000 feet from the center located on the radio station site, as described in the deed to the defendant of January 9, 1920, and falsely reporting that he had executed a deed transferring to the Navy Department full title to the radio station, with its easements, whereas the only title he had obtained was burdened with certain unlawful conditions. The defendant Baker represented to the Navy Department that the site of the distant control radio station was greatly needed, and was of great value to the government, and that the tract of land leased to him on August 26, 1919, was of no practical value to the government, notwithstanding his former report that the whole of the San Geronimo Reservation was necessary to the radio station at San Juan, and that it would be a benefit to the United States.

These statements were false and fraudulent, and known to him to be such when they were made, and were made with the intent of deceiving the Navy Department, and thereby

transferring to him valuable property of the United States worth over $500,000 for easements on property of no value to the United States.

On June 7, 1920, the defendant Baker and his wife signed a deed to the United States purporting to convey the land described as parcels No. 1 and No. 2, contrary to the representation of the defendant Baker that he would obtain and convey full title to the property in question, and that he had executed a deed transferring full title, and contrary to the provisions of the option contract. The deed contained the following provision, inconsistent with the full and complete title, namely:

"Fourth. The present sale is carried out with the condition that the purchasing party, Lieutenant Commander Virgil Baker, U. S. Navy (retired), will transfer the parcels in question to the Navy Department of the United States within the term of one year, to the effect that the said department will utilize the said parcels in constructing and maintaining in operation therein a wireless station within a term of two years following the date of transfer; it being stipulated that, if the said wireless station should not be constructed within the said term of two years, then the purchasing party or his successor in title will return to the Loiza Sugar Company the parcels of land now sold for the same consideration of $200 which have now been paid for them, and it being equally agreed in the same manner and for the same price that, in the event of abandonment or transfer of the said station to any other place after its construction and operation, the improvements and structures of the said wireless station shall become the property of the Loiza Sugar Company, if they shall not have been removed within a period of three months following the date of the return of the property in each of the two cases above stated."

On January 22, 1920, the Navy Department reported to Congress that a suitable site had been located for the distant control radio station, in reliance upon the recommendations of the defendant, Baker; that the site was very valuable and greatly needed; that Baker had already procured full title, and had transferred full title to the government. On November 13, 1920, overlooking the fact that prior thereto the Navy Department had determined that the land was unsuitable and the construction of said station had been abandoned as not feasible, the Navy Department recommended the enactment by Congress of the Act of July 12, 1921, which

27 F.(2d)—55

had been urged by the defendant, and is as follows:

"That as consideration for a suitable site and requisite rights, privileges, and easements for a receiving and distant control radio station in Porto Rico, the Secretary of the Navy be, and he hereby is, authorized to exchange or lease for such period as he may deem proper any land under naval control in Porto Rico not otherwise required for naval purposes: Provided, that in time of war or national emergency, if necessary, the Navy Department shall have without cost free and unlimited use of any land so exchanged or leased." Comp. St. § 2804ee.

Before the act was passed, parcels No. 1 and No. 2 had been found unsuitable for a distant control radio station; the construction of such station was abandoned by the Navy Department on August 13, 1920; and the acquisition of a site became unnecessary. No other site was procured by the defendant prior to the execution of the lease for 999 years, as hereinafter described. After the establishment of the distant control radio station had been abandoned, and on or about August 19, 1920, the Secretary of the Navy, through an inadvertence and mistake, and overlooking the rejection of parcels No. 1 and No. 2, accepted the deed of the said defendants which purported to convey a suitable site for the station. Such acceptance, through such inadvertence, was unauthorized, and the purported transfer of the lands did not constitute the consideration required by the government, and is not binding upon the government. Pretending that the suitable site for a distant control radio station had been transferred to the United States as required by the act, the defendant Baker procured the execution by the Navy Department of an instrument dated July 15, 1921, purporting to lease to him and his heirs and assigns for a period of 999 years the portion of land on which his residence was situated, located on the San Geronimo Naval Reservation in Porto Rico (describing the lands by metes and bounds and reciting a portion of the lease).

The bill of complaint then states certain facts, on account of which it alleges that the Act of July 12, 1921, is not binding on the government, and that the defendants have failed to comply with the requirements of the act in transferring title to the United States of a suitable site for the station.

The bill recites further that the defendant at all times knew the facts which render the lease without consideration, and alleges

that the defendant Baker has not erected the concrete residence promised by him, and has not made improvements promised by him; that his representations of the value of the land conveyed by him to the government were fraudulent and false, and that his representations with regard to the distant control radio station were false and fraudulent; and that he never obtained a complete title to the said station.

In this bill, the plain intention of the complainant is to state that the defendant Baker obtained by fraud a permanent transfer to himself of land on which he acquired a residence in the San Geronimo station; that all the acts recited in the bill were leading up to the obtaining of a false and fraudulent transfer to him of the land for his private residence.

At the close of the bill the complainant alleges:

"That in all of the said transaction relating to the acquisition and transfer of lands for use by the Navy Department, the said defendant Virgil Baker was an agent of, and trustee for, the United States, and as such owed the duty of the utmost good faith and loyalty to the government in all his dealings with and for the Navy Department; that by virtue of his relation to the United States he was precluded from obtaining any personal interest in the property which was proposed to be acquired by the Navy Department, and that his claim of interest therein was against public policy, and the purported transfer of the said parcels 1 and 2, as heretofore stated, constitutes no consideration for the retention of the said 999-year lease; that your complainant is without a full, complete, and adequate remedy, save in a court of equity, where such matters are properly cognizable."

And the complainant concludes with a prayer for the cancellation of the lease and for further appropriate relief.

After certain preliminary motions had been disposed of, the defendants filed an answer to the bill, denying all allegations relating to fraud, and setting up several affirmative defenses. Later the people of Porto Rico filed a bill of intervention, claiming ownership of a portion of certain submerged land contained within the leased area; the defendants filed their answer to the bill of intervention, denying ownership, alleged by the people of Porto Rico, and alleging that the defendants had no interest in the underwater area referred to, and offering to transfer to the people of Porto Rico whatever rights the defendants had in such area without prejudice to the interests of the government.

We come at once to the question whether Congress and the Navy Department, in authorizing and executing the lease in question, acted with full knowledge of all material facts involved in the case.

It is contended by the complainant that the act of Congress is invalid for reasons of public policy, that. it was obtained by fraud, that members of Congress were misled by fraudulent representations, and that the whole transaction is fraudulent from its inception. It is necessary to examine very carefully the proofs relating to these questions.

It appears that on December 15, 1919, the defendant requested that the Secretary of the Navy submit the matter to Congress, to the end that legislation be enacted to enable the department to grant him a part of the San Geronimo Naval Reservation.

On January 2, 1920, the acting Secretary of the Navy approved the request, saying: "The department will, as requested in the reference, submit to the Congress a recommendation for legislation to authorize the transfer of title to Lieutenant Commander Baker of the tract of land within the San Geronimo station leased to him under date of August 26, 1919."

On January 22, 1920, the Secretary of the Navy wrote the Speaker of the House of Representatives the following letter:

"Inclosed herewith I have the honor to transmit a proposed draft of bill enabling the Secretary of the Navy to acquire a suitable site for a receiving and distant control radio station in Porto Rico.

"The radio station now established on the naval reservation in Porto Rico is a very important one, and for its efficient operation a receiving and distant control station must be far enough removed from the transmitting apparatus to avoid interference by the sending out of the electric impulses with the receiving of incoming messages, and there is not enough room on the naval reservation to admit of the establishment of this necessary adjunct on government owned land.

"A board was appointed by the department to select a site for said purpose, and the site chosen is part of a sugar plantation in the vicinity of the reservation, and is admirably located for the purpose. It is necessary, also, that the privilege be obtained of laying wires underground surrounding the receiving station within a circle of long radius, and the land on which this right or ease-

ment should be exercised has also been selected by the board.

"Said tracts of land are owned by two corporations, and the price at which they offered to sell the government the title and the easement respectively was, though perhaps not more than the actual value, a considerable sum, aggregating as tentatively stated somewhat more than $5,000.

"Commander Virgil Baker, who prior to the outbreak of the war was on the retired list and living in San Juan, has been recalled to active duty and is in charge of the wireless station on the naval reservation. He has a wide acquaintance on the island, and through his friendly relations with the heads of the two sugar companies he was able to secure from them the consent of the companies to part with the desired site in the one case, and to grant the requisite easements in the other case for the government's uses for nominal consideration. Previous to this, however, that is, under date of the 26th of August last, the department had in accordance with existing law leased to Commander Baker for a period of five years a small tract of unused and unserviceable land within the reservation, because of his highly valuable services during the period of the war, and of his fine previous record of service, and because of the advantage to the public interests of having resident in Porto Rico an officer of the Navy who might in case of need be called on for duty, when the circumstances might readily be such that another officer would not be available.

"The tract leased to Commander Baker, as stated above, is of no practical value to the government for any other purpose, and the site selected for the receiving and distant control radio station is greatly needed, and therefore of very considerable value to the government. The arrangement made with Commander Baker is for him to acquire the land and easements desired for the station by direct negotiation with the present owners and transfer them immediately to the government, assuming himself certain guaranties demanded by the owners against injuries to crops, persons, and live stock resulting from the laying of underground wires and the operation of the station. This guaranty the department could not undertake, and the assumption thereof by Commander Baker was another act on his part of distinct value to the government. The arrangement also contemplates that the tract heretofore leased to Commander Baker for five years, with the power of the department under the law as it now stands to renew the lease from time to time for such further periods, not exceeding five years, as it might elect, if prior authorization by Congress can be obtained, be leased to him and his heirs indefinitely or permanently transferred to him.

"The department feels that the interests of the government would be most advantageously served by the carrying out of the arrangement indicated above, and as Commander Baker is proceeding with his part of the undertaking, and will transfer the property in question to the government in consideration for the department's mere promise to endeavor to obtain authority for the transfer to him permanently of the leased tract, and to recommend that future administrations of the Navy Department extend the lease from time to time in case such permanent transfer may not be effected, a procedure that will subject him to some considerable expenses and obligate him to protect the present owners of the new site against damages, the department earnestly recommends that it be empowered, both on account of the advantages to be secured by the government as indicated and as a recognition and reward to an efficient and zealous officer, to exchange the small tract heretofore leased to Commander Baker for the important and valuable property and rights to be secured in that way, and it is urgently requested that provision in effect as embodied in the draft herewith be enacted.

"Very respectfully,
"Josephus Daniels,
"Secretary of the Navy."

The proposed bill was introduced on February 4, 1920, by a member of the committee on naval affairs of the House of Representatives. The House did not take action at that session. When Congress met in December, 1920, the Secretary of the Navy again took up the matter with Congress on December 13, 1920, calling attention to his former letter of January 22, and submitting the draft of the bill substantially as it was passed by Congress. The legislation as amended was introduced January 4, 1921, by a member of the House committee on naval affairs, he stating that he was personally cognizant of the facts in the case, having been to Porto Rico and having investigated the matter. A report of the committee of the House, in February, 1921, indorsed the transaction. The report read as follows:

"Property valued at more than $5,000, needed for the efficient operation of the distant control radio station now established on

the naval reservation in Porto Rico, has been obtained and transferred to the Navy Department by the present lessee of a small tract of unused and unserviceable land within the said reservation. The consideration for this transfer was a promise on the part of the department to endeavor to obtain authority for the permanent transfer to said lessee of the said leased tract. The committee believes that the government has been highly benefited by the arrangements stated; and recommends that authority be given the Secretary of the Navy to complete the transaction as contemplated. This section accomplishes that purpose. * * *"

On April 14, 1921, the section referred to was incorporated as a part of the Naval Appropriation Bill, as follows:

"That as consideration for a suitable site and requisite rights, privileges, and easements for a receiving and distant control radio station in Porto Rico the Secretary of the Navy be, and he hereby is, authorized to exchange or lease for such period as he may deem proper any land under naval control in Porto Rico not otherwise required for naval purposes: Provided, that in time of war or national emergency, if necessary, the Navy Department shall have without cost free and unlimited use of any land so exchanged or leased."

The acting Solicitor of the navy, on May 14, 1921, sent a memorandum to the Senate committee on naval affairs, inclosing copies of the department's letters to the Speaker of the House, and calling attention to the fact that the Secretary of the Navy had promised that permission be granted to the department to convey the leased residence site to Commander Baker "outright, or for a long period, as the Secretary of the Navy should deem expedient."

After the appropriation had passed the Senate, in the debate which followed on the floor of the House, it was shown that the committee had acted unanimously, and that the House understood that the bill was to carry out an agreement which had been made by the Navy Department with Commander Baker with reference to the exchange of property regarded as of advantage to the navy; and that Commander Baker had complied with his part of the agreement. After full debate, on June 29, 1921, the provision was acted upon by the House. The act was approved by the President on July 12, 1921. The bill of complaint alleges that the Secretary of the Navy acted by mistake in requesting legislation, and the inference is that Congress was misled.

We think the proofs do not show that Congress was misled or mistaken. Clearly Congress had before it all the information which the Navy Department had.

[1] But, even if we had before us only the legislative act, it is the well-established doctrine of the courts that the judiciary cannot go behind an act of Congress, to show the motives of the Legislature, or from whence it derives its knowledge. In United States v. Des Moines, etc., Co., 142 U. S. 510, 544, 12 S. Ct. 308, 317 (35 L. Ed. 1099), speaking for the court, Mr. Justice Brewer said:

"The knowledge and good faith of a Legislature are not open to question. It is conclusively presumed that a Legislature acts with full knowledge and in good faith. It is true the bill alleges that its passage was induced by the navigation company, by false representations and threats of suits; but such an allegation amounts to nothing" (citing Cooley's Constitutional Limitations [5th Ed.] 222). " * * * If evidence was required, it must be supposed that it was before the Legislature when the act was passed; and if any special finding was required to warrant the passage of the special act, it would seem that the passage of the act itself might be held to be equivalent to such finding. And, although it has sometimes been urged at the bar that the courts ought to inquire into the motives of the Legislature, where fraud and corruption were alleged, and annul their action if the allegations were established, the argument has in no case been acceded to by the judiciary, and they have never allowed the inquiry to be entered upon."

In United States v. Old Settlers, 148 U. S. 427, 466, 13 S. Ct. 650, 666 (37 L. Ed. 509), speaking for the court, Chief Justice Fuller said:

"The Court of Claims declined to go behind the treaty of 1846, upon the ground that it was not within the province of a court, either of law or equity, to determine that a treaty or an act of Congress had been procured by duress or fraud, and declare it inoperative for that reason. Fletcher v. Peck, 6 Cranch, 87, 130 [3 L. Ed. 162]; Ex parte McCardle, 7 Wall. 506, 514 [19 L. Ed. 264]; People v. Draper, 15 N. Y. 545, 555; Railroad Company v. Cooper, 33 Pa. St. 278; Wright v. Defrees, 8 Ind. 302."

See, also, Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238, 22 S. Ct. 881, 46 L. Ed. 1144; New Orleans v. Warner, 175 U. S. 120, 20 S. Ct. 44, 44 L. Ed. 96.

It is necessary to examine the proofs with care, to see whether the Navy Department

acted with full knowledge of the premises and within the authority conferred by the act of Congress. The material portions of the lease are:

Lease.

"The Secretary of the Navy, representing the United States of America and the Navy Department, and having been duly authorized by the Congress under the provisions of section 5 of the Naval Appropriation Act approved by the President of the United States on July 12, 1921, does hereby lease to the said Lieutenant Commander Virgil Baker, U. S. Navy (retired), and his heirs and assigns, for a period of nine hundred and ninety-nine (999) years from the date hereof, for such use and improvement as they may deem proper, the following described site of land, with right of way thereto, which site of land is not otherwise required for naval purposes and is located in the San Geronimo Naval Reservation in the island of Porto Rico."

Following a description of the site the lease continues:

"The lease of the above-described site of land in the San Geronimo Naval Reservation is made in consideration of the transfer, by the said Lieutenant Commander Virgil Baker, U. S. Navy (retired), and his wife, Stella May Baker, to the United States of America, represented by the Secretary of the Navy, of a tract of land and easements for a distant control radio station in Porto Rico, as described in the deed number twenty-eight executed on the seventh day of June, nineteen hundred and twenty, at San Juan, Porto Rico, before the Notary Don Eduardo Acuna Aybar, and in further consideration of the payment this date to the United States of America of the sum of one dollar ($1.00) by the said Lieutenant Commander Virgil Baker, U. S. Navy (retired), and in recognition of services rendered by him in the war against the German Empire and in other wars, and in recognition of valuable services rendered by him in May, nineteen hundred and twenty, while not on active duty, which services aided materially in saving the United States army transport Northern Pacific, then stranded in a dangerous position on a reef off the island of Porto Rico.

"In accordance with the desire of the party of the first part this lease is granted in lieu of the complete transfer of title provided for in previous agreements hereinbefore mentioned, and is accepted by the party of the second part in complete and entire satisfaction of all such previous agreements. It is also mutually understood and agreed that this lease is not revocable except by mutual agreement of both parties, but that the Navy Department shall retain title to said site of land and, in accordance with the provisions of the act of Congress authorizing the grant of this lease, it is mutually understood and agreed that the Navy Department shall have in time of war or national emergency, if necessary, free and unlimited use without cost, of the site of land herein leased.

"The improvements that the party of the second part guarantees to make in and upon said leased site of land include the construction of a two-story concrete residence on the site of the old Ft. San Geronimo of a size suitable for a home for his family, which consists of his wife and six children; the construction of a one-story concrete house for garage and servant quarters; the filling of the tidewater section of the laguna within the site to a level of at least two feet above high water, and the construction of a boathouse thereon; the filling of all the low marshy land which comprises a large part of the site."

The lease was prepared by the Solicitor for the Navy Department, and was signed by Theodore Roosevelt, Acting Secretary of the Navy, after it was read and explained to him by Solicitor Neagle. Secretary Roosevelt is not produced as a witness. If he had been called, his testimony would have been quite important on the question whether the lease was signed by inadvertence or mistake. Later, in a letter written in July, 1923, he said that this property had been "permanently leased by proper authority to Lieutenant Commander Virgil Baker, U. S. Navy (retired), subject to certain reservations which apply only during time of war."

The proofs are persuasive that he, as well as the Navy Department, knew the material facts relating to and leading up to the lease, and that there was no mistake or inadvertence in making it. Admiral Griffin, the highest technical naval authority, affixed his initials to the lease, as he has testified. He said further that he relied on sources of information other than Commander Baker, and that he had full knowledge of the situation. Commander White testified that he made an independent investigation; Admiral Oman also approved the transaction.

It appears that the form of the transfer, namely, a long lease, was undoubtedly adopted by the Navy Department in order that there should be no question of retaking the entire property from the defendant Baker, without cost, "in case of war or national emergency."

The Navy Department was of the opinion that the land transferred was not otherwise required for naval purposes, and it would require overwhelming evidence to induce a court to find that it was required for naval purposes against the decision of the government, by its Navy Department, that it was not so required. The remainder of the 60-acre San Geronimo reservation in the hands of the Navy was useful as a location for quarters, as a site for the San Juan wireless station, and for dockage purposes. The tract transferred to Baker, comprising about 12 acres, exclusive of under-water area, was not suitable for naval purposes, other than the building of quarters which Commander Baker was to build, and this fact is shown to have been distinctly before the Navy Department, and the department found it "of no practical value to the government for any other purpose." The land contained no flat, level space, except some swampy land. The rest of the San Geronimo reservation contains flat, level space suitable for a wireless station. The tract had been examined fully by the officers of the Navy Department. The south part of the large tract situated at the south of the road is the only part suitable for dockage, except as a dockage for small craft. There was also enough suitable high ground for quarters outside the Baker tract. The naval officers found that the leased area is the least desirable portion for any use, except as a residence, and at the time of the lease there were no quarters on the Baker tract suitable for use, except those subject to great expense for keeping them up, out of all proportion to the rental value. The house on top of the old Ft. San Geronimo, occupied by Baker, was in an advanced stage of decay, as is shown by the testimony of Admiral Benson, who testifies that the maintenance of the house by Baker was considered a benefit to the Navy, and that the retention of the tract by the Navy would have served no useful purpose.

[2] It appears by the testimony that every requirement imposed by the act of Congress was fully complied with by the Navy Department. There is, perhaps, no need of showing this by the testimony; for, when the Executive Department of the government has passed on the prerequisites of an act of Congress, there is a presumption of the regularity of such administrative acts. United States v. Chemical Foundation, 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131; United States v. Crusell, 14 Wall. 1, 20 L. Ed. 821; Oliver v. United States (C. C. A.) 267 F. 544; Stockslager v. United States (C. C. A.) 116 F.

590; Snow v. Weeks, 75 Me. 105; Bruce v. Holden, 21 Pick. (Mass.) 187; Foster v. Berry, 14 R. I. 601.

Does the evidence overcome the presumption of regularity on the part of the Secretary of the Navy in signing the lease for the government?

The bill of complaint attacks the lease as induced by fraudulent representations by Commander Baker, in undervaluing the property on the San Geronimo reservation leased to Commander Baker, in overvaluing the Loiza site, and in giving an insufficient title to it.

The property conveyed to Baker by lease was an interest in land. The proofs show that there was a clear intention to give a permanent right of use and enjoyment of about 12 acres of land for a residence. The lease provides: "That the Navy Department shall retain title to said site of land, and, in accordance with the provisions of the act of Congress authorizing the grant of this lease, it is mutually understood and agreed that the Navy Department shall have in time of war or national emergency, if necessary, free and unlimited use, without cost, of the site of land herein leased."

The commercial value of the whole tract is a matter of little probative value; the commercial value of the part of the tract upon which Baker had his interest is not the question at issue. The crucial question is: What was the value to the government of the interest conveyed to Commander Baker? The testimony in the District Court relating to values was not confined to this question. The testimony offered related to values of the whole tract and of the Baker tract, without reference to the rights in it which the lease gave to the defendant. Of the value of these rights the Navy Department should be the best judge. That department retains the right to the free use of the tract in case of war and of any national emergency, the department necessarily being the judge of what constitutes such "emergency."

The testimony is conflicting as to details and as to values, but not as to the general nature of the tract. One of the government witnesses, an assessor, testified that part of the tract consisted of sand dunes not over 10 to 15 feet high and that the rest was level land; but there was a long line of masonry or concrete fortifications, 15 feet high, covered with what he thought was earth, and that some, at least, of these sand dunes and fortifications must be removed before the land could be put to any commercial use. The government witness Sykes testified that, of

the 14 acres, 10 acres was sand dune land and 4 acres low land. Shortly before the lease was executed Lieutenant Featherston reported:

"A large part of the site consists of low marshy ground, and is a breeding place for mosquitoes, which are blown into the radio station by the prevailing easterly winds. Also a large part of the site consists of tidewater, in which the bottom is exposed at low tide and is foul and unsanitary."

In February, 1919, Commander Baker wrote that the undisputed possession of the whole tract of San Geronimo would be worth $50,000 to the navy before three years had passed. He was obviously referring to the entire tract of about 60 acres.

Capt. White, one of the naval officers, testified that he doubted whether the Baker tract itself was worth $10,000 in time of peace; that he himself would not want it at that price.

Some of the government witnesses testified as to the value of the Baker tract; that it was worth from $300,000 up to $750,000. Two witnesses put a valuation of over $4,000 per acre on the submerged land at Laguna Bay. All these witnesses supported their testimony by speculation as to the result of a real estate development, in which the land was to be leveled, and streets and sidewalks were to be put in, and lots sold to the public.

A prominent real estate operator testified that he doubted whether, subject to the condition for occupancy by the Navy Department in time of war, the Baker tract had any considerable commercial value; others testified that it was worth from $10,000 to $15,000; and others set a still higher valuation upon it. In a letter dated October 27, 1919, prepared by Paymaster Cane, and signed by Baker, it is said: ·

"The total area of this section is about 12 acres, of a fair value of about $200 per acre, and a total of about $2,400."

In a letter written a few weeks after, on December 1, 1919, Baker corrects this statement and says that it should have read "an average value of about $2,000 per acre, and a total value of about $24,000."

Taking all the testimony on the subject together, we think the value of $24,000 was not an unfair valuation. But we think it is not of vital importance to decide what the property was actually worth, for the proofs are clear that the property was examined and re-examined by naval officers and others, who had ample opportunity to determine its value, and that the Navy Department, before the signing of the lease, knew the value of the property, and was not deceived by any statements of the defendant Baker.

Clearly there was no misrepresentation in the statement that the property was of little value to the government in time of peace; its main value was to the government "in time of war or national emergency," and this value it still retains; and it is relieved from the burden of caring for it in time of peace. We would not undertake to dispute the opinion of the government, acting through the Navy Department, that the interest conveyed to Baker was of no personal value to the government, except for the purpose to which it was devoted by the lease.

Do the proofs show by a preponderance of evidence that there was fraud in obtaining the Loiza site for the distant control radio station, or that an incomplete title was obtained?

The proofs make it clear that the Navy Department desired the Loiza site for a district control radio statiton. The Secretary of the Navy, in January of 1920, had reported to the department that the site was greatly needed and of considerable value to the government. He details the arrangement which had been made with Lieutenant Commander Baker, who transferred to the Navy Department 9 acres of cane land and easements for the use of 270 acres more. The manager of the Loiza estate Mr. Cochran, a government witness, testified that in 1920 the 9 acres transferred were worth $300 an acre, and that the easement on the 270 acres was worth $200 an acre. Another government witness testified that the 9 acres were worth only $200 an acre. Baker reported to the government that the land could be bought, and reported the amount for which the land could be obtained. The fact that he had already obtained the title seems to us not to be of great importance, in view of the fact that the Navy Department is shown to have known that he paid only a nominal consideration, and was to give certain guaranties of some value, and that the Navy Department knew what those guaranties were. The title was passed upon by the Assistant Attorney General, who reported in May, 1920, that he was of the opinion that the acceptance of the deed and its due registration would vest in the government a valid title to the premises and easements described, conditioned that the radio station must be constructed before two years elapsed. And it is further in testimony that the Navy Department was responsible for the fact that it was not constructed within the two years. It is clear,

then, that there was no failure of consideration in regard to the title.

The record shows clearly that all the facts relating to the existence of options was known to the Navy Department. Baker testified that in December, 1919, in Washington, he discussed the options with Mr. Egerton, Solicitor of the Navy Department. The deed was accepted by Secretary of the Navy Daniels, relying fully upon Admiral Griffin, Chief of the Bureau of Engineers, and upon the Solicitor of the Navy Department, Mr. Neagle. Secretary Daniels has since testified that, if he had known that a pecuniary advantage was to result to Admiral Baker, he would not have accepted the deed. The complainant does not however, in its bill, seek to set aside the acceptance. When the deed was accepted, the Navy Department took the property with full knowledge of the premises; and the testimony shows that the department is still satisfied with it, is still in control of it, and that its intention is to hold it. Admiral Griffin testifies that the Secretary was advised of every step taken in the transaction. No reflection is cast in any way, by any person, on the high character of Secretary Daniels, or of his conscientious performance of duty, and there is no contention that either Admiral Griffin or Solicitor Neagle concealed anything from him or misrepresented anything to him.

At the time of the original negotiations, every one thought the Loiza project was going to be carried out without delay; the necessary plans were made, money allotted, and deeds called for. The complainant contends that two letters of Admiral Griffin indicated that the project was thereafter abandoned. Admiral Griffin himself has testified that the project was not thereafter abandoned, and that, at the time the lease to Baker was executed, the Loiza project had merely been temporarily postponed on account of lack of available funds. The proofs make it clear that the Navy Department knew that the Loiza tract was bought for a nominal consideration; that the department received just what it bargained for. It is immaterial that afterwards the Navy Department may have changed its mind about the immediate use to which it would put the site. Clearly the defendant Baker had nothing to do with this. Secretary Wilbur has stated:

"The fact that the Navy Department, for reasons of its own, did not utilize the said lands within the two-year period, as provided, does not reflect discredit upon his (Baker's) actions."

Commander McConnell, when in Porto Rico on a tour of inspection of Cayey and San Juan radio stations, visited the Loiza site and was personally familiar with it. He, as well as Lieutenant Hoar, the public works officer of the Virgin Islands, discussed with Commander Baker the buildings which should be erected. Commander Hooper had knowledge of the situation and was fully informed as to the acceptance and lease. Lieutenant Featherston personally examined the Loiza site and the Baker tract. One of the members of the House Committee on Naval Affairs also made a personal examination. In January, 1926, the commandant of the naval station at St. Thomas reported:

"Considering that this site is held and maintained at no expense to the navy, that it is a site which was selected by a board for the purpose of a distant control station, and is so situated as to be a very useful tract of land in case of development of an eastern West Indian base, it is the opinion of the commandant that this site should be held at least until August, 1929."

Admiral Griffin testified:

"During this whole transaction there was nothing brought to my attention in connection with Commander Baker's activity that would lead me then or since to believe that he was withholding any vital information from the government or making false representations to the department. I O. K.'d the acceptance of the deed of June 7th, and the granting of the lease of July 15th, with full knowledge of the fact that Commander Baker had requested the approval and obtained the approval of my bureau to acquire the title to this Loiza property in this particular manner and for this particular purpose, and the lease to him. Congress approved the transaction. The whole transaction was submitted to Congress and passed by a provision in the Naval Appropriation Bill of July 12, the date of the approval. So far as I have been able to learn, from what investigation I made of the question in my official capacity, I have no knowledge of any false and untrue representations made by Commander Baker to the department or to my bureau in connection with the transaction. I did not give the transaction my approval until I had a recommendation from sources other than Commander Baker."

Later, in July, 1924, the Assistant Attorney General residing at Porto Rico wrote a letter to the Secretary of the Navy, calling his attention, among other matters, to the Loiza tract transaction, to which letter, on August 11, 1924, Hon. Curtis D. Wilbur, Secretary of the Navy, replied in a long letter,

reviewing the whole transaction, and saying, among other things:

"Lieutenant Commander Baker performed his part of the understanding by transferring his interests in the lands involved within the period of one year as stipulated, and the fact that the Navy Department, for reasons of its own, did not utilize the said lands within the two-year period as provided does not reflect discredit upon his actions with regard to this transaction. And, further, the Loiza Sugar Company, from whom the land in question was acquired by Lieutenant Commander Baker, has never intimated to this department that it desired to regain possession or control of said lands.

"The said deed from Lieutenant Commander Baker and wife to the United States of America, dated June 7, 1920, was referred by this department to the Attorney General, who by his letter of May 10, 1920, returned same with the statement:

"'I am of the opinion that the acceptance of the deed in the manner prescribed and its due registration will vest in the United States a valid title to the premises and easements therein described, conditioned, however, that the radio station must be constructed before two years have elapsed, and that in case the Navy Department should at any time in the future determine it has no further need for the tracts to be acquired herein, then the same should be returned to the Loiza Sugar Company for $200, the price at which they sold it to Lieutenant Commander Baker.'

"In view of all the foregoing, the department is of the opinion that no action should be taken upon the recommendation of Mr. Wells that the lease to Lieutenant Commander Baker 'be set aside and canceled,' and that 'such civil and criminal suits as the facts may justify should be commenced at once.'"

It appears, then, that the Navy Department has had full knowledge of all the facts of the case, and that the government, acting through that department, has approved the transaction relating to the Loiza tract, as well as to everything else pertaining to the lease. The Navy Department has, we think, acted with a full knowledge of the facts in the premises from the time of the first transactions recited in the bill of complaint.

It is not necessary to review the whole proceedings shown in the record, relating to the transfer of the San Geronimo tract from the War Department to the Navy Department. In this transaction Commander Baker was active and earnest in having the transfer made. His activity, however, was not

concealed from the Navy Department. The whole department appears to have joined with him in the effort to have the tract transferred from the War Department. In this controversy between two departments of the government, the court is not called upon to take action or express an opinion. The government itself would not be divested of its title or interest in the land in case either the War or the Navy Department acquired control of the property.

Later a short term lease was given to Commander Baker by the Navy Department; but we find no proof that there was any concealment touching this matter.

We find it unnecessary to enter into details relating to all the transactions shown in the record, from 1919 to the execution of the lease. We do not find that Commander Baker concealed material facts from the Navy Department, but that he acted in co-operation with the department.

With reference to the transfer of the San Geronimo tract from the War Department, Hon. Edwin Denby, Secretary of the Navy, was called upon for a statement of facts. Among other things, he said, by letter of October 29, 1923, that the transfer of December 15, 1919, effected an unqualified transfer of the land from the War to the Navy Department, and that it is clear that the Navy Department had a rightful and unincumbered possession, custody, and control of the entire San Geronimo tract, except the leasehold for an interest in a small parcel thereof granted by the Secretary of the Navy to Lieutenant Commander Virgil Baker under authority of the Act of July 12, 1921.

On July 3, 1923, the United States attorney at Porto Rico called the attention of the Attorney General to this lease and made complaints, closing his letter as follows:

"This property, since the date of the execution of the lease, has been and is now occupied by Lieutenant Commander Baker for his private purposes, and lately he has constructed a solid stone wall on the land side of this property, and I understand is soon to erect a new residence thereon.

"This matter is mentioned, because the same is receiving unfavorable comment, for the reason that the lease purports to be executed in consideration of $1 a year rental and the same tax free, and much unfavorable criticism is being had as to the Navy Department and the administration in this matter. While there may be good and sufficient reasons why this lease was executed, yet they fail to appear to people in Porto Rico, and the fact that the matter has been kept se-

cret, and that the lease is not apparently authorized by law, is causing much unfavorable comment against the administration, on account of alleged favoritism and the leasing of public property for private purposes without any just return therefor.

"If there is any action you wish me to take in this matter, I wish you would advise me fully."

To this letter the Judge Advocate General of the Navy replied on February 12, 1924, saying, after certain formalities, as follows:

"I transmit herewith for your information a copy of this department's letter of October 29, 1923, to the Bureau of Engineering, wherein is set forth a full statement of the facts and circumstances attending the granting of said lease.

"The lease having been granted conformably to law and with due formality, the criticisms of the district attorney, which were made without full information in the premises and seem to be based on biased complaint made to him that the grant was illegal, appear to require no further action by the Department of Justice.

"Respectfully,    J. L. Latimer,

"Judge Advocate General of the Navy."

In the letter to which we have already referred, the district attorney, who had now become Assistant Attorney General, wrote to the Navy Department in regard to the Loiza tract; he also discussed many matters relating to the lease; he obtained the reply to which we have already called attention, saying, among other things: "The department is of the opinion that no action should be taken upon the recommendation of Mr. Wells that the lease to Lieutenant Commander Baker 'be set aside and canceled,' and that 'such civil and criminal suits as the facts may justify should be commenced at once.'"

It will be seen that, under the terms of the lease, Commander Baker was to proceed with the improvement of the interest in land so conveyed to him. The proofs show that he did so proceed. On June 30, 1923, Lieutenant Commander C. T. Hull, district communication superintendent of San Juan, wrote to the Governor of the Virgin Islands that Commander Baker "has prepared plans and assembled material and begun work toward replacing the old frame structure referred to in paragraph 2 of reference (a) with a permanent concrete residence in accordance with the terms of his lease. The old frame structure referred to is in such a dilapidated condition and is so weakened structurally by decay that the permanent repair or rebuilding of it would not be practicable. The only other building to which allusion might be intended in paragraph 2 of reference (a) is a new one-story concrete building erected by Lieutenant Commander Baker in accordance with the terms of his lease.

"In addition to the above-mentioned improvements, Lieut. Comdr. Baker has done considerable grading, filling of tidewater section and low ground, and filling or draining old moats, all of which is of sanitary value to the entire naval reservation and the naval radio station, as these old moats and low ground were a menace to health as mosquito-breeding places. He also has built a stone wall around the exposed part of the section mentioned in paragraph 6, and this wall would be of distinct military advantage should the Navy Department ever avail itself of its rights in the lease.

"It is evident from the above that Lieut. Comdr. Baker is proceeding in good faith in carrying out the terms of his lease, and he has already expended about $5,000 in improvements on his leasehold."

After this controversy arose, it is shown that Commander Baker did not proceed with his building, but was awaiting the result of the litigation.

[3] It is contended that one element of fraud in Commander Baker's conduct was the fact that, while he was negotiating with the Navy Department, he was acting in a fiduciary capacity, and that such action, being in fact for his own private benefit, was of a fraudulent character. It appears from the proofs that, at the time Commander Baker was negotiating with the Navy Department, he had been advised that he was shortly to be relieved from active duty, and that he was actually relieved in January, 1920. In December, 1919, he stated to the department his intention of asking permission to deal with the Navy Department on his own behalf. In his letter of December 3, 1919, he requests authority to secure and transfer to the Navy Department a site for a distant control radio station, and he requests the approval of the department of a transfer to him of a permanent title, subject to certain conditions, during war, of a small tract of land on which he had been granted a five-year lease by the Navy Department for a nominal sum. In his interviews with Admiral Oman, Governor of the Virgin Islands, in December, 1919, the commander made it clear that he would act in his individual capacity. The proofs show that the Navy Department understood that he was so act-

ing. The letter from the Secretary of the Navy to the Speaker of the House, in January, 1920, which is quoted in this opinion, shows that Congress was given facts from which it might properly infer that the purchase was to be made by Baker as an individual. And it is conclusively to be presumed that Congress has acted with knowledge and in good faith. United States v. Des Moines Co., 142 U. S. 510, 12 S. Ct. 308, 35 L. Ed. 1099; Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238, 22 S. Ct. 881, 46 L. Ed. 1144.

Admiral Griffin testifies that it was not deemed at all improper by his bureau for Commander Baker to acquire title in his individual capacity, and he suggested: "We regarded it rather as advantageous to us, because we had more or less difficulty in getting appropriation for radio sites."

It is urged that the lease, obtained at the request of the Navy Department and authorized by the act of Congress, was against public policy. We think that the action of Congress settles the question of public policy. In 6 Ruling Case Law, § 108, it is said:

"*Public Policy.* It is generally recognized that the public policy of a state is to be found in its Constitution and statutes, and only in the absence of any declaration in these instruments may it be determined from judicial decisions. In order to ascertain the public policy of a state in respect to any matter, the acts of the legislative department should be looked to, because a legislative act, if constitutional, declares in terms the policy of the state and is final so far as the courts are concerned. All questions of policy are for the determination of the Legislature, and not for the courts, and there is no public policy which prohibits the Legislature from doing anything which the Constitution does not prohibit. Hence the courts are not at liberty to declare a law void as in violation of public policy. In accordance with these general principles, it has been said that if a state Constitution authorizes a grant, through legislative action, of an exclusive privilege, it must be deemed to be in accord with the policy of the state. Where courts intrude into their decrees their opinion on questions of public policy, they in effect constitute the judicial tribunals as law-making bodies in usurpation of the powers of the Legislature." R. C. L. 6, "Constitutional Law, § 108."

In the License Tax Cases, 5 Wall. 462, 18 L. Ed. 497, it was urged that certain statutes were against public policy. Speaking for the court, Chief Justice Chase said:

"This court can know nothing of public policy, except from the Constitution and the laws, and the course of administration and decision. It has no legislative powers. It cannot amend or modify any legislative acts. It cannot examine questions as expedient or inexpedient, as politic or impolitic. Considerations of that sort must, in general, be addressed to the Legislature. Questions of policy, determined there, are concluded here."

In Red "C" Oil Mfg. Co. v. Board of Agriculture, 222 U. S. 380, 32 S. Ct. 152, 56 L. Ed. 240, speaking for the Supreme Court, Mr. Justice White said: "A law cannot be declared invalid because in the opinion of the court it does not accord with sound policy. The appeal for redress in such case must be to the law-making power." In Cooley's Constitutional Limitations (8th Ed. 1927) volume 1, pp. 379, 380, the author says: "* * * They [the courts] must assume that legislative discretion has been properly exercised. If evidence was required, it must be supposed that it was before the Legislature when the act was passed; and if any special finding was required to warrant the passage of the particular act, it would seem that the passage of the act itself might be held equivalent to such finding."

[4] We must hold, then, that the decision of Congress is the final word in reference to what constitutes public policy in all matters confided to it by the Constitution or law. United States v. Trans-Missouri Freight Ass'n, 166 U. S. 290, 17 S. Ct. 540, 41 L. Ed. 1007; Dewey v. United States, 178 U. S. 510, 20 S. Ct. 981, 44 L. Ed. 1170; Spead v. Tomlinson, 73 N. H. 46, 59 A. 376, 68 L. R. A. 432; Carroll v. East St. Louis, 67 Ill. 568, 16 Am. Rep. 632; 22 R. C. L. "Public Lands," § 61; Fletcher v. Peck, 6 Cranch, 87, 130, 3 L. Ed. 162.

[5, 6] The decision of Congress is final also as to the policy of allowing the defendant to accept any provision for a residence, or to accept anything beyond his ordinary salary. The record shows that the defendant was dealing with the government, in a business transaction, with the full knowledge and approval of his superiors, including the Navy Department. In passing the special act authorizing the lease, Congress must be presumed to have in contemplation any general statute of the United States providing that officers whose salaries are fixed by law shall receive no additional pay, extra allowance, or compensation in any form. In United States v. Matthews, 173 U. S. 381, 386, 19 S. Ct. 413, 43 L. Ed. 738, the Supreme Court had before it a case in which two deputy

marshals claimed a $500 reward offered by the Attorney General for the arrest and conviction of a certain criminal; an act of Congress having authorized such a reward to be offered. The United States cited the general statute that "officers in any branch of the public service, or any * * * person whose salary, pay or emoluments are fixed by law or regulations," are prohibited "from receiving" any additional pay, extra allowance or compensation in any form whatever." The statute contained the further provision that "no civil officer of the government shall hereafter receive any compensation or perquisites, directly or indirectly, from the treasury or property of the United States, beyond his salary or compensation allowed by law." Speaking for the Supreme Court, Mr. Justice White said:

"As the reward was sanctioned by the statute making the appropriation and was embraced within the offer of the Attorney General, it clearly, under any view of the case, was removed from the provisions of the statutes in question. The appropriation act being a special and later enactment operated necessarily to engraft upon the prior and general statute an exception to the extent of the power conferred on the Attorney General and necessary for the exercise of the discretion lodged in him for the purpose of carrying out the provisions of the later and special act."

In the instant case, every one connected with the matter, including Congress and the Navy Department, knew exactly the status occupied by Commander Baker at the time the act was passed and the lease was made. The specific act authorizing the lease must be held to show the intent to make an exception to the general statute to which we have referred. United States v. Chemical Foundation Co., 272 U. S. 1, 47 S. Ct. 1, 71 L. Ed. 131; United States v. Matthews, 173 U. S. 381, 19 S. Ct. 413, 43 L. Ed. 738; Hemmer v. United States (C. C. A.) 204 F. 898, 906; Baird v. Mayor, etc., 96 N. Y. 567; Townsend v. Little, 109 U. S. 504, 512, 3 S. Ct. 357, 27 L. Ed. 1012.

The learned counsel for the complainants has cited Pan-Am. Petroleum Co. v. United States, 273 U. S. 456, 47 S. Ct. 416, 71 L. Ed. 734, and Mammoth Oil Co. v. United States, 275 U. S. 13, 48 S. Ct. 1, 72 L. Ed. ——, as controlling upon this question. We think these cases present facts so different from those involved in the instant case that the cases cited by complainant do not aid us in coming to a conclusion. In the case before us Congress appears to have acted with the lease in question directly before it, and with a clear knowledge of the premises.

[7] We have shown from the proofs that Congress authorized the lease in question after the details of the transaction had been fully known, and after the lease had been prepared by the Navy Department and submitted. The action of Congress settled the question of public policy in the transaction. We are of the opinion that it settled also all matters relating to the disposition of public property, and that its exercise of discretion upon this subject cannot be questioned by the courts. In discussing the question of public lands, 22 Ruling Case Law, § 9, 33, it is said:

"*Authority of Congress over Public Domain.*—Congress is invested by the federal Constitution with the power of disposing of, and making needful rules and regulations respecting, the public domain. * * * Under it, Congress has the sole power to declare the dignity and effect of titles emanating from the United States, and, as it is not restrained by the Constitution from passing such a law, its propriety and constitutionality cannot be questioned. It may divest itself at once of all property in a portion of the public lands, and transfer it to an individual. It may also so legislate as to make the issuance of a patent necessary to effectuate that object."

In United States v. Realty Co., 163 U. S. 427, 441, 16 S. Ct. 1120, 1126 (41 L. Ed. 215), speaking for the Supreme Court, Mr. Justice Peckham said:

"Payments to individuals, not of right or of a merely legal claim, but payments in the nature of a gratuity, yet having some feature of moral obligation to support them, have been made by the government by virtue of acts of Congress, appropriating the public money, ever since its foundation. Some of the acts were based upon considerations of pure charity. A long list of acts directing payments of the above general character is appended to the brief of one of the counsel for the defendants in error. The acts are referred to not for the purpose of asserting their validity in all cases, but as evidence of what has been the practice of Congress since the adoption of the Constitution."

See, also, Heirs of Emerson v. Hall, 13 Pet. 409, 10 L. Ed. 223; United States v. Jordan, 113 U. S. 418, 5 S. Ct. 585, 28 L. Ed. 1013; United States v. Price, 116 U. S. 43, 6 S. Ct. 235, 29 L. Ed. 541; United States v. Realty Co., supra; Marion, etc., Ry. Co. v. United States, 270 U. S. 280, 46 S. Ct.

253, 70 L. Ed. 585; Williams v. Heard, 140 U. S. 529, 11 S. Ct. 885, 35 L. Ed. 550.

The complainant has cited, on this subject, United States Grain Corporation v. Phillips, 261 U. S. 106, 43 S. Ct. 283, 67 L. Ed. 552, and other cases. We think these cases do not differ in doctrine from the cases to which we have referred.

The people of Porto Rico have filed a bill of intervention, alleging that the deed by the United States to Baker includes underwater area, and that United States could not lease such area to Baker, because it belonged to the insular government, the people of Porto Rico, and that Baker defrauded the United States. The defendants answered, tendering a quitclaim deed by Commander Baker to the people of Porto Rico of all rights which the defendants had in such area, without prejudice to the interests of the United States.

It will be seen that the government included the underwater area in their lease. The bill of complaint alleges that the tract, including the underwater area, belonged to the United States. We do not think it necessary to discuss the action of the people in the insular government with reference to this underwater area. So far as this suit is concerned, we think this question is settled by the tender by Commander Baker of a quitclaim deed to the insular government. This tendered deed was to "release, relinquish, and quitclaim in favor of the people of Porto Rico any right, title, or interest which he has or may have by virtue of the said lease of July 15, 1921, to the submerged area." It seems clear to us that, if the insular government in fact owned this area, the lease by the United States to Baker was a nullity to this extent, and, if any bill of intervention were filed, it should have been directed primarily against the United States. We think the matter is covered by the offer to release by quitclaim deed, and that, in any event, the proofs do not show that Commander Baker has defrauded the government in the matter of the submerged area.

We have seen that, in all matters relating to the execution of the lease, the Navy Department had full knowledge of the material facts in the premises. It becomes evident that the controversy did not arise at the instigation of the Navy Department, or, so far as the record shows, of any department of the government. The bill of complaint is signed and sworn to by the United States attorney, who appears to be acting for the United States Attorney General, although no affirmative authority is brought to our attention in the bill or in the proofs.

[8] We have examined with care the questions brought before us by the bill of complaint. We are of the opinion that the complainant has not shown by a preponderance of evidence that the lease in question was obtained by fraud. On the other hand, the testimony clearly shows that the government, through its Navy Department, was fully informed of the material matters involved in the act of Congress authorizing the lease and in the making of the lease itself.

The decree of the District Court of the United States for the District of Porto Rico is reversed, and the case is remanded to that court, with instructions that the bill of complaint and the bill of intervention be dismissed.